[Crim. No. 3822. Second Dist., Div. Three. Dec. 7, 1944.]

THE PEOPLE, Respondent, v. ISABELLE GRAYBEHL, Appellant.

Hahn, Graf & Ross for Appellant.

Robert W. Kenny, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendant was accused of the crime of violation of section 501 of the Vehicle Code, a felony. It was alleged that on or about July 5, 1943, she did unlawfully drive an automobile, while under the influence of intoxicat-

ing liquor, and in an unlawful manner, proximately causing bodily injury to Emily Yakimowich, a human being. She was accused further in a second count of the crime of negligent homicide, a felony. It was alleged in that count that she did unlawfully drive a motor vehicle thereby causing the death of said Emily Yakimowich. The second count was dismissed on motion of the defendant. In a trial by jury the defendant was found guilty as charged in the first count. Probation was granted for five years upon condition that she serve six months in the county jail, reimburse the family of deceased for funeral expenses, refrain from the use of intoxicating liquor, and not operate a motor vehicle. The imposing of sentence was suspended. Defendant appeals from the order denying her motion for a new trial.

Section 501 of the Vehicle Code provides in part: "Any person who, while under the influence of intoxicating liquor, drives a vehicle and when so driving does any act forbidden by law or neglects any duty imposed by law in the driving of such vehicle, which act or neglect proximately causes bodily injury to any person, is guilty of a felony. . . ."

Defendant contends that the verdict was contrary to the evidence. Her argument is that she was not under the influence of intoxicating liquor; that while driving a vehicle she did not do any act forbidden by law, nor neglect to do any duty imposed by law; and that the bodily injury suffered was not a proximate result of an alleged dirty windshield.

On July 5, 1943, the defendant and Madeline Groendyke went in defendant's automobile to a picnic near Sunland. While they were there, from 11 a. m. to 4:30 p. m., defendant drank "about one or two beers." After leaving the picnic they went to defendant's home at Roscoe, then to Mrs. Groendyke's home at North Hollywood, and then to a café "to have a beer." While they were in the café, from 6 p. m. to 6:45 p. m., defendant drank some beer, and had an altercation with Mrs. Groendyke while trying to get Mrs. Groendyke to go home. The amount of beer which defendant drank will be referred to hereinafter. After leaving that place they were intending to go to Mrs. Groendyke's home and were proceeding north on Laurel Canyon Boulevard (north of Ventura Boulevard) about 8:10 p. m. when, according to the testimony of defendant, the defendant saw the body of Emily Yakimowich lying in the street, and defendant "went around

the side and pulled up a ways," stopped, and "tried to pick her up."

Emily Yakimowich, a woman about thirty-five years of age, died on July 5, 1943, on Laurel Canyon Boulevard at the place hereinafter described as the scene of the accident. She died as a result of a right basal skull fracture.

Robert Holroyd, a witness called by the People, testified that on July 5, 1943, "a little after 6 o'clock" when "it was getting dark," he was driving his automobile in a northerly direction on Laurel Canyon Boulevard and he saw defendant and Mrs. Groendyke standing over the body of Emily Yakimowich, which was lying on the concrete part of the street; that he stopped his automobile, and before he got out of it, defendant said, "My God, I have run over this woman, help me do something"; that he jumped out of his automobile, looked at the woman who was lying in the street, saw blood running from her head, and he ran to a nearby house and asked a man to call an ambulance; that he remained at the scene until the ambulance had taken the body away—about twenty minutes; that he did not see defendant's automobile while he was there; that the body was lying about ten feet from the curbing; that he had just turned his automobile lights on when he was about a quarter of a mile from the place where the body was lying; that his wife and daughter were with him; that he did not communicate with the police that night, but when he read in the newspaper the next morning that the defendant had denied "running over the woman" he telephoned to the police department and reported what he had seen and heard.

A police officer testified that when he arrived at the scene of the accident about 8:40 p. m. the body was not there; that he went into a nearby house and there he saw the defendant and Mrs. Groendyke; that he caused the defendant to walk to her automobile and get in it; that he asked her when she first saw the injured person, and she said, "The first I seen of the woman was when she was on my front fender; I thought she was riding a bicycle, she was so high"; that defendant's breath was alcoholic; that he observed her as she walked, and she "was weaving all around and throwing her arms and crying," and was hysterical; that a pool of blood was on Laurel Canyon Boulevard about 20 feet and 2 inches west of the easterly curb and "almost in the center of the block,"

i. e., about midway between two street intersections; that adjoining the concrete portion of the boulevard there was a macadam shoulder which was 19 feet and 7 inches in width; that the pool of blood was on the concrete portion of the highway about 8 or 9 inches from the edge of the macadam; that the front of defendant's automobile was about 135 feet north of the pool of blood and was close to the curb; that the right front fender had a bulge in the middle of its right side, which bulge appeared to be fresh; that there was a spot about the size of a penny on the front part of the right front fender, which spot appeared to be blood; that the windshield on defendant's automobile "was very dirty," and "was full of dust and rain spots," and the visibility through it "was very poor"; that the surface of the pavement was dry, and the weather was clear; that he did not see any skid marks; and that he took defendant from her car to a police car.

Another police officer, who went to the scene with the officer just mentioned, testified the same as that officer testified concerning the measurements and the blood on the pavement; that he did not see any skid marks; and that the windshield "was very dirty and had water spots on it," and the visibility through it "was pretty poor."

Another police officer, who arrived at the scene about 9 p..m., testified that he saw the defendant walk to the police automobile; that he talked with her in the police automobile when they were taking her to the receiving hospital for a sobriety test; that her breath was alcoholic; that he was present when the physician examined her for sobriety; that in his opinion she was under the influence of intoxicating liquor; that she said that after she had returned from an outing she had drunk three glasses of beer, that she was driving the automobile when the accident happened, that she did not see the woman before she hit her, and that her attention was attracted to the fact that something was wrong when her passenger, Mrs. Groendyke, said: "Stop, you have hit a person"; and that she also said that when she saw the girl in front of her it appeared to her as if the girl were riding a bicycle.

The proprietor of the café, where defendant and Mrs. Groendyke had been before the accident, testified that Emily Yakimowich was an employee at his café and it was expected that she would arrive there that evening; that she lived about 1½ miles southwest of the café and in order to get to the café from her home she would travel north on Laurel Canyon

Boulevard; that he saw defendant and Mrs. Groendyke at his café on July 5th and they were there from 6 p. m. until 6 :45 p. m.; that in his opinion defendant was intoxicated; and that she was served one drink in his place, but he did not know what kind of drink it was.

The physician at the receiving hospital, who examined defendant for sobriety at 9.45 p. m., testified that defendant was intoxicated.

Another police officer testified that he examined defendant's automobile on July 7th at her home; that the front bumper brackets, which extended from the bumper to the frame of the car, were bent and the bumper had been moved back 4 inches toward the car; that the left bumper guard on the front bumper had been moved to the left about ¾ of an inch; that in the dust on the apron of a front fender (it does not appear which one) there were "ribbed marks of clothing" about 19 inches in length; and that the windshield "was very dusty," and "had water spots on it and it was very hard to see through in daylight."

The husband of defendant testified that he went to the scene of the accident on July 5th, and that one of the officers, the defendant and he looked carefully at the automobile (referred to herein as the defendant's automobile), and the officer "admitted" that "he could not see a thing with the exception of some old dents"; that the dents in the car, including the bent fender, the bent bumper and the "moved" bumper-bracket, were caused in 1941 when he was using the car to push his brother's car; that those damaged parts of the car had never been repaired. In response to a question as to whether defendant was intoxicated, he said, "I don't believe so—— no, she was not." He testified further that he drove the car home from the scene of the accident, after having been told by the police that he could drive it; that there was no blood spot on the car; and that there were no "brush marks" or any marks on the car indicating that something had slid over the surface of it.

The brother of defendant's husband testified the same as defendant's husband had testified concerning the dents in the car.

The defendant testified that she drank "about one or two beers" while she was at the picnic; that she drank a beer in the café; that she was not intoxicated; that the windshield

was clear to her; that when she first saw the injured person the person was lying in the street with her face down, "and I saw this person *over* my left fender (italics added)." In response to a question as to whether she told an officer that she saw the injured person *on* the fender, she said, "I told . . . [the officer] I saw her over my left fender." Defendant testified further that her car did not strike the injured person; that she stopped her car "before reaching the body"; that she "went around the side and pulled up a ways, and then tried to pick her up"; that she was going "around twenty miles an hour"; that the first time she saw the witness Holroyd, who testified that he arrived at the scene when defendant and Mrs. Groendyke were standing over the body, was when he was a witness in the trial court; that a man came up behind her and told her he would not touch the injured person; that she did not tell anyone that she had run over the person; that she went to a nearby house to call an ambulance, and a man there called the ambulance; that while she was in the house she washed blood off her hands and arms; that she was in the house when the officer came there; that there were no dents in the car that had not been there before the officer arrived; that she did not tell an officer that Mrs. Groendyke said, "Stop, you have hit a person"; and that she did not say to an officer that "I thought she was riding a bicycle, she was so high."

It was conceded that defendant was driving the automobile.

■ . The evidence was sufficient to support the implied findings of the jury that the automobile, driven by defendant, struck and injured Emily Yakimowich; and that defendant was under the influence of intoxicating liquor when the injury occurred.

■ As above noted, in order to constitute the offense of which appellant was convicted under section 501 of the Vehicle Code, there must be an unlawful act or neglect of legal duty in addition to the unlawful act of driving an automobile while under the influence of intoxicating liquor, and that such additional unlawful act or neglect must be a proximate cause of the bodily injury. Section 677 of the Vehicle Code provides in part: "It shall be unlawful to operate any motor vehicle upon a highway when the windshield is in such a defective condition as to impair the driver's vision." ■ The evidence was sufficient to justify a finding that the windshield of defendant's automobile at the time of the injury was in

such a defective condition as to impair the driver's vision. In driving the automobile when the windshield was in such condition, defendant committed an act forbidden by law; and she neglected a duty imposed upon her by law, namely, the duty of removing such condition of the windshield before operating the automobile upon a highway.

The remaining question is whether said unlawful act or neglect of legal duty in operating the automobile was a proximate cause of the injury. In the case of *Jones* v. *Barion* (1930), 103 Cal.App. 59 [283 P. 885], which was an action for damages for personal injuries sustained by a pedestrian who was struck by an automobile, the atmospheric visibility at the time of the accident was good, but the "windshield was hazy" as a result of moisture thereon which had accumulated when defendant's automobile was on a ferry shortly before the accident. The court therein said at page 61: "Under the evidence outlined the jury would have been warranted in finding the appellant negligent for the condition of his windshield and his failure to see respondent. . . ." In *Norton* v. *Puter* (1934), 138 Cal.App. 253 [32 P.2d 172], which was an action for damages for personal injuries sustained by a guest in an automobile as a result of the overturning of the automobile, the action was based upon the wilful misconduct of the driver. In that case the driver's view of the highway was obscured by rain which had accumulated on the windshield, the automatic windshield-wiper having ceased to operate. In holding therein that defendant was guilty of wilful misconduct which proximately contributed to the happening of the accident, and in reciting various parts of the evidence which indicated the wilful misconduct, the court said in part at page 257: "The defendant knew the pavement was wet and slippery; his vision was obscured by the falling rain and the water on his windshield; the windshield wiper was not operating. . . ." Those cases are referred to for the purpose of showing that it has been held that evidence that a windshield obscured a driver's vision was material evidence upon the question of negligence in operating an automobile, and upon the question of proximate cause of an injury.

The matter of visibility was one of the important questions in the trial. The evidence, in the light favorable to the People, established that defendant did not see the injured person before the automobile struck her, and that defendant's atten-

tion was first attracted to the injured person when defendant's passenger told her she had hit a person. The ability of the defendant to see the injured person before the automobile struck her was impaired undoubtedly by reason of defendant's intoxication. Also her ability to see the injured person before the automobile struck her was impaired undoubtedly by reason of the dirty windshield, especially since the accident occurred at nightfall. Defendant's failure to see the injured person before the accident might have been by reason of her intoxication, or by reason of the dirty windshield, or both, or various other things. It was a question of fact for the jury as to what was the proximate cause of the injury. The evidence was sufficient to support the implied finding of the jury that the impaired vision of the defendant by reason of such condition of the windshield was a proximate cause of the bodily injury to Emily Yakimowich.

The order denying the motion for a new trial is affirmed.

Desmond, P. J., and Fox, J. pro tem., concurred.