[Crim. No. 595. Fourth Dist. Nov. 4, 1948.]

THE PEOPLE, Respondent, v. RUSSELL JAMES TUCKER, Appellant.

W. G. Machetanz for Appellant.

Fred N. Howser, Attorney General, and James A. Doherty, Deputy Attorney General, for Respondent.

GRIFFIN, J.—Defendant was charged with violating section 501 of the Vehicle Code in that, while driving under the influence of intoxicating liquor he willfully and unlawfully failed, neglected and refused to drive his car upon the right-hand side of a highway, which act is forbidden by law and which proximately caused bodily injury to one C. F. Boyd and one Mildred Davis. After pleading not guilty, defendant was found guilty by a jury. A motion for a new trial on four separate grounds was denied. He was granted probation for three years on condition that he serve 10 months in the Industrial Road Camp and pay a fine of $500 within 60 days after his release from the camp. Defendant was granted a stay of execution pending appeal.

Defendant, accompanied by Mildred Davis, drove a Chevrolet coupe easterly on a two-lane highway, No. 198 in Tulare County, about 11:30 p. m. on September 28th. He became involved in an automobile accident with a 1935 Ford sedan driven in a westerly direction by Boyd.

Boyd testified that he was proceeding westerly on the north one-half of Highway 198 at about 45 miles per hour; that there was an intersection of highways about 673 feet east of the point of collision and that before he reached that intersection he had overtaken and passed another car proceeding in the same direction; that he had returned to his side of the highway before reaching the intersection and was traveling near the north edge thereof when his car was struck by another car; that as a result of the collision he was knocked unconscious and later removed to the hospital, and that he did not remember anything that happened just before, at the time of, or immediately after the accident.

A member of the California Highway Patrol testified that there was evidence of "gouge marks" in the north one-half of the highway about 4 feet 4 inches from the north edge of the road; that tire burns proceeded along the north edge of the north half of that road westerly toward the point of collision; that the "gouge marks" were evidently made by reason of a "blown" tire; that he found defendant seated behind the steering wheel of his car and suffering from injuries; that defendant's automobile was headed in an easterly direction in the north one-half portion of the highway near the north edge of the pavement and it was facing in a northeasterly direction; that Boyd's Ford was facing in a northwesterly direction and the front portions of the two cars were together; that at a point approximately 30 or 40 feet east of the point of colli-

sion there was a driveway into what is known as the Sahara Club, located on the north side of the highway; that when he arrived at the scene of the accident Boyd was out of his car and stretched out on some seat cushions; that defendant and Mrs. Davis were still in the Chevrolet. The witness indicated, by reference to some map not before us, that near the north edge of the pavement some construction work was going on.

A Dr. Brady, a physician and surgeon at the Visalia Clinic, was then called as a witness. He testified that he treated defendant and the other injured persons at the clinic that night; that Mrs. Davis had suffered injuries and subsequently died; that Boyd had several bad cuts but less serious injuries than Mrs. Davis; that he treated defendant Tucker shortly after midnight; that he was bleeding profusely from a large scalp wound, facial lacerations, and that he had a compound fracture of the upper jawbone. He then said that at the suggestion of the highway patrolman he took a blood sample of defendant Tucker; that he ''didn't believe'' he discussed the taking of the blood sample with the defendant and he was rather doubtful whether defendant ''knew anything much that went on . . . although he did answer questions'' and responded ''by doing as he was asked to do.'' This blood specimen was delivered to Dr. Neal at 8:30 a. m. for analysis, to determine the alcoholic content. After showing his qualifications in that field and the tests actually employed in making the analysis, the doctor, over objections, was permitted to state that he found the alcoholic content to be 3.5 milligrams of alcohol per c. c.; that that means ''that the amount of alcohol in the blood has reached that measurement, and that is a measurement something like a weight or a volume like teaspoons or tablespoons of alcohol;'' that ''that much alcohol indicates a definite degree of intoxication. . . . Using a scale beginning with one-half of a milligram, it is questionable whether there is any effect from the alcohol in the blood. At one milligram there is the least perceptible effect from the alcohol. At the level of two milligrams the amount of alcohol is sufficient to definitely interfere with a person's ability to do skilled acts. At three miligrams a state of distinct intoxication or distinct inability to perform ordinary acts is definite. At four milligrams a person is dead drunk. They lose consciousness as a rule''; that ''a person with a 3.5 test would be definitely under the influence of intoxicating liquor . . .'' and ''his ability to drive an automobile safely on the highway'' would be impaired; that ''it would not be safe for him,

a man with a 3.5 test, to be on the highway driving an automobile''; that he ran this test twice to ''prevent experimental errors or to prevent an error in performance . . . And in both tests it came out 3.5.''

The People than rested their case. Defendant took the stand and testified that he did not ''remember anything about that accident'' either before or afterwards; that it was about a week thereafter before he remembered anything; that his memory of past events is getting better; that ''I was a little punch drunk there for quite a while as far as that is.''

Mrs. Davis's daughter testified that she saw defendant on the evening of December 28th about 10:30 p. m.; that in her opinion he was not at that time under the influence of intoxicating liquor. On cross-examination she testified, however, that defendant and Mrs. Davis said that they had been eating at ''Vic's Place'' and were at ''Shaw's Place.'' Her testimony was corroborated by her husband. The defendant then rested his case.

In rebuttal the People called a bartender employed at ''Shaw's Place.'' He testified that he saw defendant and Mrs. Davis in his place of business about 10 a. m. on December 28th; that he did not ''remember whether they drank or not.'' At this point the prosecution claimed surprise at the answer of the witness and was permitted to cross-examine him on his answer to the question. Thereafter, the witness testified that he told an investigator for the district attorney's office that ''I might have sold him one drink. I don't remember whether I did or whether I didn't. Pretty hard to remember that far back.'' In answer to this question: ''You don't recall telling Mr. Lotito that you sold the defendant a mixed drink?'' the defendant answered: ''I don't remember who I sold it to. I couldn't say as to whether he taken it or Fred or who taken it. It is pretty hard to remember that far back. Q. Now that you are remembering better how many drinks did you make up? A. I couldn't say. Q. One or four? A. I couldn't say. Q. You do remember mixing a drink now? A. Yes.''

The bartender at ''Vic's Place'' was called. He testified that he saw defendant and Mrs. Davis and one other couple there between 10 a. m. and 1 p. m. on December 28th; that he served the ''four of them drinks''; that as to the number of times he served them he said ''One, two, three, something like that''; that he went off duty between 1 and 4 p. m.; that when he returned at 4 p. m. he said ''I think they were

still there at the bar'' and he didn't ''remember them leaving''; that he went off duty at 8 p. m.

The investigator for the district attorney, Mr. Lotito, was then called and he stated that the bartender at ''Vic's Place'' told him that he went off duty between 2 and 4 p. m.; that when he came back the party of four were ''still sitting at the bar drinking'' and that they did leave between 5 and 8 p. m. that evening; that four or five drinks were served them, ''whiskey and soda.''

Dr. Brady was recalled. He testified that he ''specifically remembered'' that he did not smell any alcohol on defendant's breath the night of the accident.

Upon this evidence the jury found the defendant guilty as charged. Defendant raises four points on appeal: First, that the verdict is contrary to law and the evidence and that the evidence is insufficient to sustain the verdict in this (1) that there is no evidence that defendant was under the influence of intoxicating liquor at the time; and (2) that there was no evidence that he was doing any act forbidden by law that proximately caused personal injuries. In this connection it is argued that the only evidence that defendant was intoxicated is the testimony of the bartenders that he may have had some intoxicating liquor during that day, and the doctors' opinion based upon the result of the laboratory test of analysis of defendant's blood for alcoholic content. It is contended that this particular test is uncertain, and that there is not a unanimity of opinion in the medical profession as to its accuracy; that standing alone such opinion evidence is not sufficient to support the finding of the jury in that respect. Counsel cites no authority in support of his contention.

 It is the general rule that expert testimony is admissible where the conclusions to be drawn by the jury depend on the existence of facts which are not common knowledge and which are peculiarly within the knowledge of men whose experience or study enables them to speak with authority thereon, and in those cases in which the conclusions to be drawn from the facts stated, as well as knowledge of the facts themselves, depend upon professional or scientific knowledge or skill not within the range of ordinary training or intelligence. In such cases not only the facts but the conclusions to which they lead, may be testified to by qualified experts. Of course any such opinion may be accepted or rejected by the jury. (*Lemley* v. *Doak Gas Eng. Co.*, 40 Cal.App. 146 [180 P. 671]; 10 Cal.Jur. § 238, p. 971; 10 Cal.Jur. § 218, p. 959;

Code Civ. Proc., § 1870, subd. 9.) ▮ The law makes no distinction in weighing evidence between expert testimony and evidence of other character. (10 Cal.Jur. § 232, p. 974; *Rolland* v. *Porterfield,* 183 Cal. 466 [191 P. 913] ; *Estate of Blake,* 136 Cal. 306 [68 P. 827, 89 Am.St.Rep. 135].) ▮ It is for the jury and not the reviewing court to determine the weight to be given such evidence. (*Dunphy* v. *Dunphy,* 161 Cal. 380 [119 P. 512, Ann.Cas. 1913B 1230, 38 L.R.A. N. S. 818].) What additional drinks defendant may have had during the day of December 28th, other than the ones disclosed, does not appear. If his party was drinking prior to the time the bartender left "Vic's Place" at 2 p. m. and they were still there after 4 p. m. when he returned to duty, the jury might reasonably believe that other drinks were consumed during that period. ▮ The fact that defendant's car was driven on the wrong side of the road is some evidence of the condition of the driver. (2 Cal.Jur. 10-Yr. Supp. § 26, p. 53.) The facts related, in addition to the testimony of the medical expert, substantially support the conclusion of the jury that the defendant was, at the time of the accident, under the influence of intoxicating liquor.

The next argument in this connection is predicated on the contention that there is no showing that defendant was doing any act forbidden by law, or neglected any duty thus imposed, in the driving of his vehicle, which act or neglect proximately caused bodily injury to any other person. The force of the argument is, as we construe it, that since defendant was charged with violating section 525(a) of the Vehicle Code requiring that upon all roads of sufficient width a vehicle shall be driven upon the right half of the roadway, with certain prescribed exceptions, the burden was upon the prosecution to show that defendant did not come within any of the exceptions specified and that defendant was entitled to the presumption that he was at all times obeying the law, citing section 1963, Code of Civil Procedure, subdivisions 4 and 33.

The testimony shows that the collision occurred in the westbound traffic lane of the highway and that defendant was driving east at the time. There is nothing in the record to indicate that defendant came within the terms of any of the subdivisions of Vehicle Code, section 525(a), which permit a car to be driven on the left-hand side of the road.

▮ Under certain circumstances, in view of one's inability because of loss of memory to testify as to his own conduct, there is a presumption that such person was exercising ordi-

nary care. (*Hoppe* v. *Bradshaw*, 42 Cal.App.2d 334 [108 P.2d 947] ; *Douglas* v. *Hoff*, 82 Cal.App.2d 82 [185 P.2d 607].) Such presumption is in itself a species of evidence and should prevail and control the jury's deliberations until and unless overcome by satisfactory evidence. (*Westberg* v. *Willde*, 14 Cal.2d 360 [94 P.2d 590] ; *Satariano* v. *Sleight*, 54 Cal.App.2d 278 [129 P.2d 35].) ■ In the instant case the evidence conclusively shows that defendant did drive upon the north half of the highway and did collide with Boyd's car which was being driven on that portion of the highway. The jury was thoroughly instructed in the language of section 525, subdivision (a), of the Vehicle Code and all of its subdivisions pertaining to exceptions. Its conclusion was that the defendant's conduct, including the benefit of the claimed presumption, did not bring him within any of the exceptions designated. Therefore, the jury's verdict in reference thereto cannot be disturbed on appeal. (*People* v. *Dawes*, 37 Cal. App.2d 44 [98 P.2d 787] ; *People* v. *Fator*, 14 Cal.App.2d 403 [58 P.2d 402] ; *People* v. *Sanders*, 28 Cal.App.2d 746 [83 P.2d 720] ; *People* v. *Trantham*, 24 Cal.App.2d 177 [74 P.2d 851] ; *People* v. *Graybehl*, 67 Cal.App.2d 210 [153 P.2d 771].)

The second ground pressed involves defendant's requested instructions numbers 3 and 6, which were refused. At defendant's request the court did instruct the jury to the effect that "the mere fact that defendant may have been driving an automobile upon the left-hand side of the highway . . . is not of itself, standing alone and unexplained, sufficient to constitute the doing of an act forbidden by law . . . You should consider all other evidence in the case in deciding whether the defendant's location on the highway at the time of the accident constituted a violation of the law, because unless he was violating some law at the time of the accident, other than driving an automobile upon a public highway while under the influence of intoxicating liquor, you cannot find him guilty of the offense charged."

■ Defendant's instruction number 6 pertained to the question of the right of the jury to find the defendant guilty of the lesser offense prescribed by section 502 of the Vehicle Code if it entertained a reasonable doubt as to whether defendant did an act forbidden by law which proximately caused bodily injury. We perceive no error in refusing to give the proffered instruction under the circumstances related. The evidence conclusively shows that Boyd's car was in the north lane of traffic at the time; that the defendant's car was

also there, and there is no showing that defendant had any right to be traveling in that portion of the highway under the conditions disclosed. In view of these circumstances defendant cannot claim error. The evidence does not justify the giving of the proposed instruction in reference to a lesser offense particularly where the jury were instructed, at defendant's request, that if they should find that by defendant's location on the highway at the time of the accident he was not violating some law, the jury could not find the defendant guilty of the offense charged. Apparently, from its verdict it did believe defendant was violating the law as charged. In *People* v. *McCoy*, 25 Cal.2d 177, 187 [153 P.2d 315], it was held that the trial court may properly refuse to instruct on simple assault where the evidence is such as to make it clear that if the defendant is guilty at all, he is guilty of the higher offense, and that in a criminal case instructions are always to be given or refused with reference to the facts introduced before the jury.

Defendant's instruction number 3 involves the sudden peril rule. We perceive no evidence that was introduced entitling defendant to such an instruction. In *People* v. *Boulware*, 41 Cal.App.2d 268 [106 P.2d 436], it was held error to refuse such an instruction. However, in that case there was testimony of the defendant driver that he did see an oncoming driver of a truck and that he swerved to the right to avoid a collision with it and in doing so collided with another car. In that case there was evidence before the jury which might properly have warranted the giving of such an instruction. In *Randolph* v. *Hunt*, 41 Cal.App. 739 [183 P. 358], it was held that in an action for damages for the death of the father of the plaintiffs while traveling on foot upon a public highway through having been struck by defendant's automobile, there was a reasonable excuse for the presence of the deceased on the east or left-hand side of the highway and, as he was not aware of the approach of the machine until it was virtually upon him, the driver not having given timely warning, the deceased was, under the stress of the sudden peril, excusable for jumping, as he did, to escape the injury. Here we have no such evidence and defendant's evidence does not show a situation which would call for or entitle him to such an instruction. (See, also, 3 Cal.Jur. § 67, p. 836; 3 Cal.Jur. § 72, p. 841, and cases cited.)

The third point involves defendant's objection to the use of the doctors' testimony as to the alcoholic content of the

blood specimen. He objected to this line of testimony on the ground that the sample was taken without his consent or knowledge, and while he was suffering from shock and cerebral concussion, in violation of article I, section 13 of the state Constitution, and the Fifth Amendment to the federal Constitution, and sections 688-1323 of the Penal Code. In support of this contention he cites *People* v. *Strong,* 114 Cal. App. 522, 530 [300 P. 84] ; *People* v. *Akens,* 25 Cal.App. 373, 376 [143 P. 795] ; and *People* v. *Bundy,* 168 Cal. 777, 781 [145 P. 537]. Cases involving the admissibility of evidence as to scientific analytical tests for intoxication, based upon alcoholic content of the specimen of some bodily fluid such as blood or urine or of the breath, are correlated in 127 American Law Reports, page 1513. It would appear that upon the laying of a proper foundation such evidence is admissible. (*State* v. *Jones,* 124 Conn. 664 [2 A.2d 374] ; *Kuroske* v. *Aetna Life Insurance Co.,* 234 Wis. 394 [291 N.W. 384, 127 A.L.R. 1505].) The admissibility of such evidence where the specimen of bodily fluid used was taken ''without his consent and where he was compelled to submit to such tests against his will and wishes'' is likewise discussed and it is generally held in other states that where the accused is compelled to submit to such tests against his will it violates his constitutional right in that he may not ''be compelled to give testimony against himself,'' and upon proper objections such evidence is inadmissible. Other cases hold that where there is no evidence of compulsion or entrapment such evidence is admissible. (See, *State* v. *Morkrid* (Iowa), 286 N.W. 412; *State* v. *Gatton,* 60 Ohio App. 192 [20 N.E.2d 265] ; *Schmidt* v. *District Attorney of Monroe Co.,* 255 App.Div. 353 [8 N.Y.S.2d 787].) The cases cited by defendant hold to the general rule that a defendant may not be *compelled* or required, *against his consent* to submit to an examination by a physician. Our attention has not been called to any California case directly involving the point here raised. However, *People* v. *Mayen,* 188 Cal. 237 [205 P. 435, 24 A.L.R. 1383], presented the question of the admissibility of certain evidence obtained from defendant other than by lawful search warrant. It was there held that the Fourth Amendment to the Constitution of the United States, relating to searches and seizures only applies to the federal government and its agencies ; and that where competent evidence is produced on a trial the courts will not stop to inquire or investigate the source from whence it comes or the means by which it was obtained; and that the seizure by

officers of the law of private papers and effects by unlawful and unauthorized entry and search, to be used as evidence in criminal prosecutions of the persons from whom taken, is a violation of the constitutional right to security against unreasonable search and seizures, but the subsequent use of articles so taken as evidence is not itself any part of the unlawful invasion of such constitutional guaranty.

*People* v. *One 1941 Mercury Sedan,* 74 Cal.App.2d 199 [168 P.2d 443], held that in a proceeding for forfeiture of an automobile used for transportation of marihuana, wherein it appeared that the driver on his apprehension had swallowed some brown paper which he had in his hands, evidence as to the narcotic content of the substances pumped from his stomach was not privileged under Constitution, article I, section 13, and should have been admitted, since such evidence did not depend on the *testimonial utterances* of the driver for its probative force; and that the privilege against self-incrimination does not preclude the introduction of physical disclosures a defendant is forced to make or the results of tests to which he has involuntarily submitted; that the privilege only protects the individual from any forced disclosures made by him, whether oral or written; and that it is limited to the protection against testimonial compulsion.

*State* v. *Cram,* 176 Ore. 577 [160 P.2d 283], is factually similar to the instant case and the same question was there presented. It was there said that the admission of testimony concerning the alcoholic content of a blood sample taken from an automobile driver following an accident and at a time when he was unconscious and under arrest and where there was a subsequent prosecution for manslaughter based on death as a result of such accident, it was not a violation of defendant's constitutional privilege against self-incrimination.

Under the circumstances here related it cannot be said that the trial court erred in overruling defendant's objection to the admissibility of such evidence.

■ The last question presented involves a statement of the prosecuting attorney made to the jury in his closing argument, commenting upon Mr. Lotito's testimony. He said: ''Mr. Lotito has been an investigator in the District Attorney's office for 32 years under different heads. In fact, for 14 years of that period Mr. Machetanz was in that same office. You will note that Mr. Machetanz did not ask any questions of Mr. Lotito.'' It is contended that by this statement the prosecuting

attorney "insinuated" that defendant's counsel knew that Mr. Lotito was telling the truth because he had worked with him for 14 years. If this statement, by any stretch of the imagination, so indicated and if it may be classed as misconduct, in the absence of objection by counsel and a request to the trial court to admonish the jury to disregard such statement, we are unable to hold that it was prejudicial.

Order denying a new trial affirmed.

Barnard, P. J., and Mussell, J., concurred.

A petition for a rehearing was denied November 19, 1948, and appellant's petition for a hearing by the Supreme Court was denied December 2, 1948. Carter, J., and Schauer, J., voted for a hearing.