## ROCHIN *v.* CALIFORNIA.

No. 83.  Argued October 16, 1951.—Decided January 2, 1952.

*Dolly Lee Butler* and *A. L. Wirin* argued the cause and filed a brief for petitioner.

*Howard S. Goldin,* Deputy Attorney General of California, argued the cause for respondent.  With him on the brief were *Edmund G. Brown,* Attorney General, *Clarence A. Linn,* Assistant Attorney General, and *Frank W. Richards,* Deputy Attorney General.

*Fred Okrand, A. L. Wirin, Edward J. Ennis, Morris L. Ernst, Osmond K. Fraenkel, Arthur Garfield Hays, Herbert M. Levy* and *Clore Warne* filed a brief for the American Civil Liberties Union, as *amicus curiae,* urging reversal.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

· Having "some information that [the petitioner here] was selling narcotics," three deputy sheriffs of the County of Los Angeles, on the morning of July 1, 1949, made for the two-story dwelling house in which Rochin lived with his mother, common-law wife, brothers and sisters. Finding the outside door open, they entered and then forced open the door to Rochin's room on the second floor. Inside they found petitioner sitting partly dressed on the side of the bed, upon which his wife was lying. On a "night stand" beside the bed the deputies spied two capsules. When asked "Whose stuff is this?" Rochin seized the capsules and put them in his mouth. A struggle ensued, in the course of which the three officers "jumped upon him" and attempted to extract the capsules. The force they applied proved unavailing against Rochin's resistance. He was handcuffed and taken to a hospital. At the direction of one of the officers a doctor forced an emetic solution through a tube into Rochin's stomach against his will. This "stomach pumping" produced vomiting. In the vomited matter were found two capsules which proved to contain morphine.

Rochin was brought to trial before a California Superior Court, sitting without a jury, on the charge of possessing "a preparation of morphine" in violation of the California Health and Safety Code, 1947, § 11,500. Rochin was convicted and sentenced to sixty days' imprisonment. The chief evidence against him was the two capsules. They were admitted over petitioner's objection, although the means of obtaining them was frankly set forth in the testimony by one of the deputies, substantially as here narrated.

On appeal, the District Court of Appeal affirmed the conviction, despite the finding that the officers "were

guilty of unlawfully breaking into and entering defendant's room and were guilty of unlawfully assaulting and battering defendant while in the room," and "were guilty of unlawfully assaulting, battering, torturing and falsely imprisoning the defendant at the alleged hospital." 101 Cal. App. 2d 140, 143, 225 P. 2d 1, 3. One of the three judges, while finding that "the record in this case reveals a shocking series of violations of constitutional rights," concurred only because he felt bound by decisions of his Supreme Court. These, he asserted, "have been looked upon by law enforcement officers as an encouragement, if not an invitation, to the commission of such lawless acts." *Ibid.* The Supreme Court of California denied without opinion Rochin's petition for a hearing.[1] Two justices dissented from this denial, and in doing so expressed themselves thus: ". . . a conviction which rests upon evidence of incriminating objects obtained from the body of the accused by physical abuse is as invalid as a conviction which rests upon a verbal confession extracted from him by such abuse. . . . Had the evidence forced from the defendant's lips consisted of an oral confession that he illegally possessed a drug . . . he would have the protection of the rule of law which excludes coerced confessions from evidence. But because the evidence forced from his lips consisted of real objects the People of this state are permitted to base a conviction upon it. [We] find no valid ground of distinction between a verbal confession extracted by physical abuse and a confession wrested from defendant's body by physical abuse." 101 Cal. App. 2d 143, 149–150, 225 P. 2d 913, 917–918.

---

[1] The petition for a hearing is addressed to the discretion of the California Supreme Court and a denial has apparently the same significance as the denial of certiorari in this Court. Cal. Const., Art. VI, §§ 4, 4c; "Rules on Appeal," Rules 28, 29, 36 Cal. 2d 24–25 (1951). See 3 Stan. L. Rev. 243–269 (1951).

This Court granted certiorari, 341 U. S. 939, because a serious question is raised as to the limitations which the Due Process Clause of the Fourteenth Amendment imposes on the conduct of criminal proceedings by the States.

In our federal system the administration of criminal justice is predominantly committed to the care of the States. The power to define crimes belongs to Congress only as an appropriate means of carrying into execution its limited grant of legislative powers. U. S. Const., Art. I, § 8, cl. 18. Broadly speaking, crimes in the United States are what the laws of the individual States make them, subject to the limitations of Art. I, § 10, cl. 1, in the original Constitution, prohibiting bills of attainder and *ex post facto* laws, and of the Thirteenth and Fourteenth Amendments.

These limitations, in the main, concern not restrictions upon the powers of the States to define crime, except in the restricted area where federal authority has preempted the field, but restrictions upon the manner in which the States may enforce their penal codes. Accordingly, in reviewing a State criminal conviction under a claim of right guaranteed by the Due Process Clause of the Fourteenth Amendment, from which is derived the most far-reaching and most frequent federal basis of challenging State criminal justice, "we must be deeply mindful of the responsibilities of the States for the enforcement of criminal laws, and exercise with due humility our merely negative function in subjecting convictions from state courts to the very narrow scrutiny which the Due Process Clause of the Fourteenth Amendment authorizes." *Malinski* v. *New York*, 324 U. S. 401, 412, 418. Due process of law, "itself a historical product," *Jackman* v. *Rosenbaum Co.*, 260 U. S. 22, 31, is not to be turned into a destructive dogma against the States in the administration of their systems of criminal justice.

However, this Court too has its responsibility. Regard for the requirements of the Due Process Clause "inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings [resulting in a conviction] in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses." *Malinski* v. *New York, supra,* at 416–417. These standards of justice are not authoritatively formulated anywhere as though they were specifics. Due process of law is a summarized constitutional guarantee of respect for those personal immunities which, as Mr. Justice Cardozo twice wrote for the Court, are "so rooted in the traditions and conscience of our people as to be ranked as fundamental," *Snyder* v. *Massachusetts,* 291 U. S. 97, 105, or are "implicit in the concept of ordered liberty." *Palko* v. *Connecticut,* 302 U. S. 319, 325.[2]

The Court's function in the observance of this settled conception of the Due Process Clause does not leave us without adequate guides in subjecting State criminal procedures to constitutional judgment. In dealing not with the machinery of government but with human rights, the absence of formal exactitude, or want of fixity of meaning, is not an unusual or even regrettable attribute of constitutional provisions. Words being symbols do not speak without a gloss. On the one hand the gloss may be the deposit of history, whereby a term gains technical content. Thus the requirements of the Sixth and Seventh Amendments for trial by jury in the federal

---

[2] What is here summarized was deemed by a majority of the Court, in *Malinski* v. *New York,* 324 U. S. 401, 412 and 438, to be "the controlling principles upon which this Court reviews on constitutional grounds a state court conviction for crime." They have been applied by this Court many times, long before and since the *Malinski* case.

courts have a rigid meaning. No changes or chances can alter the content of the verbal symbol of "jury"—a body of twelve men who must reach a unanimous conclusion if the verdict is to go against the defendant.[3] On the other hand, the gloss of some of the verbal symbols of the Constitution does not give them a fixed technical content. It exacts a continuing process of application.

When the gloss has thus not been fixed but is a function of the process of judgment, the judgment is bound to fall differently at different times and differently at the same time through different judges. Even more specific provisions, such as the guaranty of freedom of speech and the detailed protection against unreasonable searches and seizures, have inevitably evoked as sharp divisions in this Court as the least specific and most comprehensive protection of liberties, the Due Process Clause.

The vague contours of the Due Process Clause do not leave judges at large.[4] We may not draw on our merely personal and private notions and disregard the limits that bind judges in their judicial function. Even though the concept of due process of law is not final and fixed, these limits are derived from considerations that are fused in the whole nature of our judicial process. See Cardozo,

---

[3] This is the federal jury required constitutionally although England and at least half of the States have in some civil cases juries which are composed of less than 12 or whose verdict may be less than unanimous. See County Courts Act, 1934, 24 & 25 Geo. V, c. 53, § 93; Arizona State Legislative Bureau, Legislative Briefs No. 4, Grand and Petit Juries in the United States, v–vi (Feb. 15, 1940); The Council of State Governments, The Book of the States, 1950–1951, 515.

[4] Burke's observations on the method of ascertaining law by judges are pertinent:

"Your committee do not find any positive law which binds the judges of the courts in Westminster-hall publicly to give a reasoned opinion from the bench, in support of their judgment upon matters that are stated before them. But the course hath prevailed from

The Nature of the Judicial Process; The Growth of the Law; The Paradoxes of Legal Science. These are considerations deeply rooted in reason and in the compelling traditions of the legal profession. The Due Process Clause places upon this Court the duty of exercising a judgment, within the narrow confines of judicial power in reviewing State convictions, upon interests of society pushing in opposite directions.

Due process of law thus conceived is not to be derided as resort to a revival of "natural law." [5]  To believe that this judicial exercise of judgment could be avoided by freezing "due process of law" at some fixed stage of time or thought is to suggest that the most important aspect of constitutional adjudication is a function for inanimate machines and not for judges, for whom the independence safeguarded by Article III of the Constitution was designed and who are presumably guided by established standards of judicial behavior. Even cybernetics has not yet made that haughty claim. To practice the requisite detachment and to achieve sufficient objectivity no doubt demands of judges the habit of self-discipline and self-criticism, incertitude that one's own views are incontestable and alert tolerance toward views not shared. But

---

the oldest times. It hath been so general and so uniform, that it must be considered as the law of the land." Report of the Committee of Managers on the Causes of the Duration of Mr. Hastings's Trial, 4 Speeches of Edmund Burke (1816) 200–201.

And Burke had an answer for those who argue that the liberty of the citizen cannot be adequately protected by the flexible conception of due process of law:

". . . the English jurisprudence has not any other sure foundation, nor consequently the lives and properties of the subject any sure hold, but in the maxims, rules, and principles, and juridical traditionary line of decisions . . . ." *Id.*, at 201.

[5] Morris R. Cohen, "Jus Naturale Redivivum," 25 Philosophical Review 761 (1916), and "Natural Rights and Positive Law," Reason and Nature (1931), 401–426; F. Pollock, "The History of the Law of Nature," Essays in the Law (1922), 31–79.

these are precisely the presuppositions of our judicial process. They are precisely the qualities society has a right to expect from those entrusted with ultimate judicial power.

Restraints on our jurisdiction are self-imposed only in the sense that there is from our decisions no immediate appeal short of impeachment or constitutional amendment. But that does not make due process of law a matter of judicial caprice. The faculties of the Due Process Clause may be indefinite and vague, but the mode of their ascertainment is not self-willed. In each case "due process of law" requires an evaluation based on a disinterested inquiry pursued in the spirit of science, on a balanced order of facts exactly and fairly stated, on the detached consideration of conflicting claims, see *Hudson County Water Co.* v. *McCarter,* 209 U. S. 349, 355, on a judgment not *ad hoc* and episodic but duly mindful of reconciling the needs both of continuity and of change in a progressive society.

Applying these general considerations to the circumstances of the present case, we are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation.

It has long since ceased to be true that due process of law is heedless of the means by which otherwise relevant and credible evidence is obtained. This was not true even before the series of recent cases enforced the constitutional principle that the States may not base convictions upon

confessions, however much verified, obtained by coer-
cion.  These decisions are not arbitrary exceptions to the
comprehensive right of States to fashion their own rules
of evidence for criminal trials.  They are not sports in our
constitutional law but applications of a general principle.
They are only instances of the general requirement that
States in their prosecutions respect certain decencies of
civilized conduct.  Due process of law, as a historic and
generative principle, precludes defining, and thereby con-
fining, these standards of conduct more precisely than to
say that convictions cannot be brought about by methods
that offend "a sense of justice."  See Mr. Chief Justice
Hughes, speaking for a unanimous Court in *Brown* v.
*Mississippi*, 297 U. S. 278, 285–286.  It would be a stul-
tification of the responsibility which the course of con-
stitutional history has cast upon this Court to hold that
in order to convict a man the police cannot extract by
force what is in his mind but can extract what is in
his stomach.[6]

To attempt in this case to distinguish what lawyers
call "real evidence" from verbal evidence is to ignore the
reasons for excluding coerced confessions.  Use of involun-
tary verbal confessions in State criminal trials is constitu-
tionally obnoxious not only because of their unreliability.
They are inadmissible under the Due Process Clause even
though statements contained in them may be independ-
ently established as true.  Coerced confessions offend the
community's sense of fair play and decency.  So here, to
sanction the brutal conduct which naturally enough was
condemned by the court whose judgment is before us,
would be to afford brutality the cloak of law.  Nothing

---

[6] As to the difference between the privilege against self-crimination
protected, in federal prosecutions, under the Fifth Amendment, and
the limitations which the Due Process Clause of the Fourteenth
Amendment imposes upon the States against the use of coerced con-
fessions, see *Brown* v. *Mississippi, supra,* at 285.

would be more calculated to discredit law and thereby to brutalize the temper of a society.

In deciding this case we do not heedlessly bring into question decisions in many States dealing with essentially different, even if related, problems. We therefore put to one side cases which have arisen in the State courts through use of modern methods and devices for discovering wrongdoers and bringing them to book. It does not fairly represent these decisions to suggest that they legalize force so brutal and so offensive to human dignity in securing evidence from a suspect as is revealed by this record. Indeed the California Supreme Court has not sanctioned this mode of securing a conviction. It merely exercised its discretion to decline a review of the conviction. All the California judges who have expressed themselves in this case have condemned the conduct in the strongest language.

We are not unmindful that hypothetical situations can be conjured up, shading imperceptibly from the circumstances of this case and by gradations producing practical differences despite seemingly logical extensions. But the Constitution is "intended to preserve practical and substantial rights, not to maintain theories." *Davis* v. *Mills,* 194 U. S. 451, 457.

On the facts of this case the conviction of the petitioner has been obtained by methods that offend the Due Process Clause. The judgment below must be

*Reversed.*

MR. JUSTICE MINTON took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, concurring.

*Adamson* v. *California,* 332 U. S. 46, 68–123, sets out reasons for my belief that state as well as federal courts and law enforcement officers must obey the Fifth Amendment's command that "No person . . . shall be com-

pelled in any criminal case to be a witness against himself." I think a person is compelled to be a witness against himself not only when he is compelled to testify, but also when as here, incriminating evidence is forcibly taken from him by a contrivance of modern science. Cf. *Boyd* v. *United States,* 116 U. S. 616; *Counselman* v. *Hitchcock,* 142 U. S. 547, 562; *Bram* v. *United States,* 168 U. S. 532; *Chambers* v. *Florida,* 309 U. S. 227. California convicted this petitioner by using against him evidence obtained in this manner, and I agree with MR. JUSTICE DOUGLAS that the case should be reversed on this ground.

In the view of a majority of the Court, however, the Fifth Amendment imposes no restraint of any kind on the states. They nevertheless hold that California's use of this evidence violated the Due Process Clause of the Fourteenth Amendment. Since they hold as I do in this case, I regret my inability to accept their interpretation without protest. But I believe that faithful adherence to the specific guarantees in the Bill of Rights insures a more permanent protection of individual liberty than that which can be afforded by the nebulous standards stated by the majority.

What the majority hold is that the Due Process Clause empowers this Court to nullify any state law if its application "shocks the conscience," offends "a sense of justice" or runs counter to the "decencies of civilized conduct." The majority emphasize that these statements do not refer to their own consciences or to their senses of justice and decency. For we are told that "we may not draw on our merely personal and private notions"; our judgment must be grounded on "considerations deeply rooted in reason and in the compelling traditions of the legal profession." We are further admonished to measure the validity of state practices, not by our reason, or by the traditions of the legal profession, but by "the community's sense of fair play and decency"; by the "traditions and conscience of our people"; or by "those canons of decency and fair-

ness which express the notions of justice of English-speaking peoples." These canons are made necessary, it is said, because of "interests of society pushing in opposite directions."

If the Due Process Clause does vest this Court with such unlimited power to invalidate laws, I am still in doubt as to why we should consider only the notions of English-speaking peoples to determine what are immutable and fundamental principles of justice. Moreover, one may well ask what avenues of investigation are open to discover "canons" of conduct so universally favored that this Court should write them into the Constitution? All we are told is that the discovery must be made by an "evaluation based on a disinterested inquiry pursued in the spirit of science, on a balanced order of facts."

Some constitutional provisions are stated in absolute and unqualified language such, for illustration, as the First Amendment stating that no law shall be passed prohibiting the free exercise of religion or abridging the freedom of speech or press. Other constitutional provisions do require courts to choose between competing policies, such as the Fourth Amendment which, by its terms, necessitates a judicial decision as to what is an "unreasonable" search or seizure. There is, however, no express constitutional language granting judicial power to invalidate *every* state law of *every* kind deemed "unreasonable" or contrary to the Court's notion of civilized decencies; yet the constitutional philosophy used by the majority has, in the past, been used to deny a state the right to fix the price of gasoline, *Williams* v. *Standard Oil Co.,* 278 U. S 235; and even the right to prevent bakers from palming off smaller for larger loaves of bread, *Jay Burns Baking Co.* v. *Bryan,* 264 U. S. 504. These cases, and others,[1]

---

[1] See n. 12 of dissenting opinion, *Adamson* v. *California, supra,* at p. 83.

show the extent to which the evanescent standards of the majority's philosophy have been used to nullify state legislative programs passed to suppress evil economic practices. What paralyzing role this same philosophy will play in the future economic affairs of this country is impossible to predict. Of even graver concern, however, is the use of the philosophy to nullify the Bill of Rights. I long ago concluded that the accordion-like qualities of this philosophy must inevitably imperil all the individual liberty safeguards specifically enumerated in the Bill of Rights.[2] Reflection and recent decisions[3] of this Court sanctioning abridgment of the freedom of speech and press have strengthened this conclusion.

MR. JUSTICE DOUGLAS, concurring.

The evidence obtained from this accused's stomach would be admissible in the majority of states where the question has been raised.[1] So far as the reported cases reveal, the only states which would probably exclude the evidence would be Arkansas, Iowa, Michigan, and Mis-

---

[2] E. g., Adamson v. California, supra, and cases cited in the dissent.

[3] American Communications Assn. v. Douds, 339 U. S. 382; Feiner v. New York, 340 U. S. 315· Dennis v. United States, 341 U. S. 494.

[1] See People v. One 1941 Mercury Sedan, 74 Cal. App. 2d 199, 168 P. 2d 443 (pumping of accused's stomach to recover swallowed narcotic); Rochin v. California, 101 Cal. App. 2d 140, 225 P. 2d 1 (pumping of accused's stomach to recover swallowed narcotic); People v. Tucker, 88 Cal. App. 2d 333, 198 P. 2d 941 (blood test to determine intoxication); State v. Ayres, 70 Idaho 18, 211 P. 2d 142 (blood test to determine intoxication); Davis v. State, 189 Md. 640, 57 A. 2d 289 (blood typing to link accused with murder); Skidmore v. State, 59 Nev. 320, 92 P. 2d 979 (examination of accused for venereal disease); State v. Sturtevant, 96 N. H. 99, 70 A. 2d 909

souri.[2]   Yet the Court now says that the rule which the majority of the states have fashioned violates the "decencies of civilized conduct."   To that I cannot agree.   It is a rule formulated by responsible courts with judges as sensitive as we are to the proper standards for law administration.

As an original matter it might be debatable whether the provision in the Fifth Amendment that no person "shall be compelled in any criminal case to be a witness against himself" serves the ends of justice.   Not all civilized legal procedures recognize it.[3]   But the choice was made by the Framers, a choice which sets a standard for legal trials in this country.   The Framers made it

---

(blood test to determine intoxication); *State* v. *Alexander,* 7 N. J. 585, 83 A. 2d 441 (blood typing to establish guilt); *State* v. *Gatton,* 60 Ohio App. 192, 20 N. E. 2d 265 (commenting on refusal to submit to blood test or urinalysis to determine intoxication); *State* v. *Nutt,* 78 Ohio App. 336, 65 N. E. 2d 675 (commenting on refusal to submit to urinalysis to determine intoxication); but cf. *Booker* v. *Cincinnati,* 1 Ohio Supp. 152 (examination and urinalysis to determine intoxication); *State* v. *Cram,* 176 Ore. 577, 160 P. 2d 283, 164 A. L. R. 952, 967 (blood test to determine intoxication); *Commonwealth* v. *Statti,* 166 Pa. Super. 577, 73 A. 2d 688 (blood typing linking accused to assault).

[2] *Bethel* v. *State,* 178 Ark. 277, 10 S. W. 2d 370 (examination for venereal disease); *State* v. *Height,* 117 Iowa 650, 91 N. W. 935 (examination for venereal disease); *State* v. *Weltha,* 228 Iowa 519, 292 N. W. 148 (blood test to determine intoxication, limiting rules on search and seizure); but cf. *State* v. *Benson,* 230 Iowa 1168, 300 N. W. 275 (comment on refusal to submit to blood test to determine intoxication); *People* v. *Corder,* 244 Mich. 274, 221 N. W. 309 (examination for venereal disease); but see *People* v. *Placido,* 310 Mich. 404, 408, 17 N. W. 2d 230, 232; *State* v. *Newcomb,* 220 Mo. 54, 119 S. W. 405 (examination for venereal disease); *State* v. *Matsinger,* 180 S. W. 856 (examination for venereal disease).

[3] See Ploscowe, The Investigating Magistrate in European Criminal Procedure, 33 Mich. L. Rev. 1010 (1935).

a standard of due process for prosecutions by the Federal Government. If it is a requirement of due process for a trial in the federal courthouse, it is impossible for me to say it is not a requirement of due process for a trial in the state courthouse. That was the issue recently surveyed in *Adamson* v. *California,* 332 U. S. 46. The Court rejected the view that compelled testimony should be excluded and held in substance that the accused in a state trial can be forced to testify against himself. I disagree. Of course an accused can be compelled to be present at the trial, to stand, to sit, to turn this way or that, and to try on a cap or a coat. See *Holt* v. *United States,* 218 U. S. 245, 252–253. But I think that words taken from his lips, capsules taken from his stomach, blood taken from his veins are all inadmissible provided they are taken from him without his consent. They are inadmissible because of the command of the Fifth Amendment.

That is an unequivocal, definite and workable rule of evidence for state and federal courts. But we cannot in fairness free the state courts from that command and yet excoriate them for flouting the "decencies of civilized conduct" when they admit the evidence. That is to make the rule turn not on the Constitution but on the idiosyncrasies of the judges who sit here.

The damage of the view sponsored by the Court in this case may not be conspicuous here. But it is part of the same philosophy that produced *Betts* v. *Brady,* 316 U. S. 455, denying counsel to an accused in a state trial against the command of the Sixth Amendment, and *Wolf* v. *Colorado,* 338 U. S. 25, allowing evidence obtained as a result of a search and seizure that is illegal under the Fourth Amendment to be introduced in a state trial. It is part of the process of erosion of civil rights of the citizen in recent years.