836 F.2d 1347
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Sharon BLASKA, Plaintiff-Appellant,
v.
Ismael FUENTES, et al., Defendants-Appellees.
 No. 86-1676.
 United States Court of Appeals, Sixth Circuit.
 Jan. 6, 1988.
 
 Before BOYCE F. MARTIN and DAVID A. NELSON, Circuit Judges, CONTIE, Senior Circuit Judge.
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 This is an appeal from a judgment entered on a jury verdict in favor of two state police officers who, with their superiors, were sued in federal court under 42 U.S.C. Sec. 1983 for using excessive force in placing the plaintiff under arrest. The most significant of the several issues raised on appeal is whether the trial court committed reversible error in basing its instructions to the jury on a "substantive due process" theory rather than on the Fourth Amendment. Judicial perceptions of the legal principles applicable to this sort of case have been in a state of flux, and, perhaps not surprisingly, the jury charge in question is not a model of analytical excellence. We shall affirm the judgment, however, because the instructions as a whole were eminently fair, and because we are satisfied that the verdict of the jury would have been no different had the instructions contained the slight changes in wording necessary to bring them into conformity with the law as we currently understand it.
 
 
 2
 * The plaintiff, Sharon Blaska, is a 31-year-old Tecumseh, Michigan factory worker who lives with a man named Eugene Wegner. On March 12, 1982--a Friday--Ms. Blaska and Mr. Wegner finished work at about 3:30 p.m. Soon thereafter they and another couple repaired to a place of refreshment called the Wagon Wheel, where they spent most of the evening drinking, talking, and playing pool. It was Mr. Wegner's subsequent recollection that he had "approximately ten to twelve" beers, while Ms. Blaska testified that she consumed less than three bottles of beer.
 
 
 3
 Mr. Wegner and Ms. Blaska had driven to the Wagon Wheel in different cars, and when the party broke up, shortly after 10:00 p.m., each left in his own vehicle. Two Michigan State Troopers, defendants Ismael Fuentes and Steven Swabash, saw Mr. Wegner driving erratically as he made his way homeward. Activating the red flashers on their cruiser, they pulled Mr. Wegner's car over to the side of the road. When Plaintiff Blaska came upon the stopped vehicles, she parked her car behind the cruiser and got out to join the others. There is a sharp conflict in the evidence as to what happened next.
 
 
 4
 The troopers' version is that as they were talking to Mr. Wegner, Ms. Blaska walked up, asked "What the hell's going on here," and started advising Mr. Wegner that he had done nothing wrong and ought not to cooperate with the police in any way. Mr. Wegner allegedly told her to "stay out of it."
 
 
 5
 When the troopers undertook to test Mr. Wegner for sobriety, they said, Ms. Blaska told Mr. Wegner "You've done nothing wrong. You're not drunk, you know. Lets leave." Mr. Wegner asked her to get back in her car, whereupon she allegedly started yelling "They have no right to do this to you!"
 
 
 6
 The troopers did not see it that way; Mr. Wegner having failed the sobriety tests, Trooper Swabash told him he was under arrest. In accordance with standard procedure, Trooper Fuentes was asked to pat Mr. Wegner down and handcuff him. As Trooper Fuentes was in the process of doing so, Ms. Blaska allegedly started yelling obscenities and charged toward him and Mr. Wegner. Trooper Swabish, who was holding a flashlight in one hand, grabbed her from behind and pulled her back. At that point, according to his testimony,
 
 
 7
 "She went totally hysterical, she started hitting me, kicking me. It was all I could do to hang on to her. And she continued to kick me in the legs. And here my partner's having trouble arresting the subject Mr. Wegner, getting the cuffs on and she's going hysterical on me."
 
 
 8
 A village patrolman, Officer Dellecese, had arrived on the scene by this time, and he helped Trooper Fuentes get Mr. Wagner handcuffed. Trooper Swabash continued the story as follows:
 
 
 9
 "A. When I seen the Officer Dellecese assist my partner, I was losing control of her, I couldn't keep her in the one hand. So I used Eugene's Wegner's car for support and I placed her up against that. And she continued to kick me and stuff. And I elevated her up on the car a little bit, just to get her off balance, off her feet, and I held her there, and that was it.
 
 
 10
 Q. Did you, to get her up on the car, you must have shoved her up on the car?
 
 
 11
 A. Yes, sir, I did.
 
 
 12
 Q. And I take it you weren't gentle with her, or were you?
 
 
 13
 A. No, I wasn't.
 
 
 14
 Q. Were you rough with her?
 
 
 15
 A. I think I used the force necessary that I had control of her. I didn't strike her or anything. I pushed her up on the car to keep her away from me.
 
 
 16
 Q. At that time, you informed her that she was under arrest?
 
 
 17
 A. At the time she grabbed Trooper Fuentes and I grabbed her, I told her she was under arret [sic]."
 
 
 18
 So much for the defendants' version of the incident. According to plaintiff Blaska's version (in which, among other things, the roles of the two troopers are reversed), her primary reason for becoming a participant in the drama herself was not to interfere with a drunken driving arrest, but to get Mr. Wegner's wallet so she could bail him out of jail:
 
 
 19
 "Well, we had been at the bar ... and I figured they would probably do a breathalyzer and maybe that he would go to jail. And he carries a lot of money in his wallet.
 
 
 20
 Q. He being Mr. Wegner?
 
 
 21
 A. Mr. Wegner carries, on Friday nights, a good sum of money. Okay? And I wanted to make sure that, if he did get arrested, that I could have his wallet before they took him, so I could bond him out of jail if he went."
 
 
 22
 After Mr. Wegner got out of his car for the sobriety tests, Ms. Blaska said, she simply stood on the curb while the tests were being administered. As she was waiting Trooper Fuentes suggested to her, in highly indelicate language, that she quit the scene:
 
 
 23
 "Well, he said get the [expletive deleted] outta here.
 
 
 24
 Q. And what did you say to him?
 
 
 25
 A. I told him that I had stopped to get Eugene's wallet, in case he was taken to jail, and that's all I wanted.
 
 
 26
 Q. When Mr., or when Trooper Fuentes made his comment to you, can you describe his tone?
 
 
 27
 A. Angry, very angry."
 
 
 28
 When the sobriety tests were finished, Ms. Blaska said, she started forward to get Mr. Wegner's wallet. After she had taken about five steps, according to her testimony,
 
 
 29
 "someone grabbed me by the back of my coat and shoved. And I started falling. And I can't remember exactly if I went down on my hands and knees, but in that direction. I came back up, got grabbed again by the back of my coat by Officer Fuentes, ran me down the back of Eugene's Mustang and threw me face down on the drunk of the car.
 
 
 30
 * * *
 
 
 31
 * * *
 
 
 32
 Q. What happened next?
 
 
 33
 A. Then I was grabbed by my coat from behind, and he turned me around and threw me back down over the trunk lid.
 
 
 34
 Q. So you were face up at this point?
 
 
 35
 A. Yes.
 
 
 36
 Q. And what happened next?
 
 
 37
 A. Well, he was climbing up on me. He put his knee like between my knees and got on top of me, like you know. And--
 
 
 38
 Q. No, I don't know. Tell me.
 
 
 39
 A. He stuck his knee between my knees to where it ended up like between my thighs and then got on top of me, just on top of me.
 
 
 40
 Q. All right. And what happened next?
 
 
 41
 A. Then he took his hand and he put it around my neck like this and was holding my neck very firmly.
 
 
 42
 Q. All right. And what happened next?
 
 
 43
 A. He was, he pulled my neck up and he slammed my face down, the back of my head into the trunk lid. And he was shouting profanities. Every time he'd slam my head on the trunk lid, he'd say it again."
 
 
 44
 During this entire period, Ms. Blaska testified, she never kicked anyone, never hit anyone, never swore at anyone, and never raised her voice.
 
 
 45
 Ms. Blaska was taken to the police station, booked, and in due course tried on charges of obstructing an arrest, resisting arrest, and assault and battery on a police officer. She was acquitted, and this federal case against the troopers followed. The jury in the federal action returned a verdict for the defendant troopers.
 
 II
 
 46
 The trial court's instructions to the jury said, among other things, that
 
 
 47
 "[i]f you find there was no probable cause to arrest the plaintiff and that her arrest was therefore [un]lawful, then you must find that any use of physical force against her was excessive and unreasonable. (Emphasis supplied.)
 
 
 48
 "If you find that a defendant arrested the plaintiff without probable cause and that he used force against her, then you must find the defendant violated Plaintiff's Constitutional Rights."
 
 
 49
 The Court then went on to give the instruction that is under challenge here:
 
 
 50
 "a police officer may use force to carry out his duties, but may not use more force than necessary in the performance of his duties. Every excessive use of force, however, does not raise itself to the level of a substantive due process violation. A Constitutional violation occurs if the use of force is so excessive or inappropriate as to shock the public conscience or offend the community sense of fair play and decency."
 
 
 51
 Ms. Blaska's lawyer made a timely objection to the latter instruction, stating
 
 
 52
 "I do not believe that to be the burden at all that we have to shock the conscience or shock the public conscience or offend the community's sense of fair play and decency. I don't believe that to be the law at all, Your Honor, regarding violations of the Fourth Amendment, which is what we are claiming in this trial."
 
 
 53
 In place of the instruction given by the court, Ms. Blaska's lawyer requested one with this language:
 
 
 54
 "An officer is entitled to use force as a reasonable person would think is required to take one arrested into custody, and this may include such physical force as is reasonably necessary to subdue a person who is struggling with an officer. However, an officer is not allowed to use any force beyond that reasonably necessary to accomplish his lawful purpose."
 
 
 55
 The court declined to give the tendered instruction.
 
 
 56
 The "shock the conscience" language in the court's charge stems from Rochin v. California, 342 U.S. 165 (1952), a case decided almost a decade before Mapp v. Ohio, 367 U.S. 643 (1961). (It was in the Mapp case that the Supreme Court held, in effect, that the states are made subject to the full sweep of the Fourth Amendment through the Due Process Clause of the Fourteenth Amendment; the Court had not gone that far in the 1950s, when Rochin was decided.)
 
 
 57
 Rochin was a case in which three deputy sheriffs had broken into the defendant's bedroom without a warrant, seized his person after he swallowed two capsules that had been sitting on a nightstand, and took him to an "alleged hospital" where they retrieved the capsules by forcing an emetic solution through a tube into his stomach, causing him to vomit. The capsules proved to contain morphine. On the basis of this evidence the defendant was convicted, in a non-jury trial, of having violated the state health and safety code. Reviewing the conviction on a writ of certiorari, the United States Supreme Court held that the state's proceedings had resulted in a deprivation of Mr. Rochin's liberty without due process of law, in violation of the Fourteenth Amendment. Speaking through Mr. Justice Frankfurter, the Court declared that
 
 
 58
 "we are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience."
 
 
 59
 Rochin, 342 U.S. at 172 (emphasis supplied).
 
 
 60
 Because, as the Supreme Court subsequently held in Mapp v. Ohio, supra, the Fourteenth Amendment prohibits a state from violating the right of the people to be secure in their persons and effects against "unreasonable searches and seizures," within the meaning of that term as used in the Fourth Amendment, we believe Ms. Blaska's counsel was correct in suggesting to the trial court that the issue in the present case was not whether the state troopers' conduct was such as to "shock the conscience;" the issue was whether there had been an "unreasonable" seizure of the sort prohibited by the Fourth Amendment.[1] That the Fourth Amendment ought to have been the focus of the inquiry seems, on balance, to be suggested by Tennessee v. Garner, 471 U.S. 1 (1985); Leber v. Smith, 773 F.2d 101 (6th Cir.1985), cert. denied, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986); and Dugan v. Brooks, 818 F.2d 513 (6th Cir.1987). "When an officer makes an arrest," as we said in Dugan, "it is a 'seizure' under the fourth amendment, and [the Fourth Amendment] requires that the means used to effect the arrest be reasonable, which is determined by balancing the extent of the intrusion against the need for it." 818 F.2d at 516.
 
 
 61
 The defendants argue, in their brief on appeal, that "it is not clear that Plaintiff pleaded a claim for excessive force under the Fourth Amendment." It seems clear to us, however, that the plaintiff did precisely that. Her complaint alleged that "[i]n effecting this arrest, defendants Fuentes and/or Swabask [sic] used violent and excessive force ... in violation of the ... Fourth ... and Fourteenth Amendments to the Constitution ...."
 
 
 62
 Even if Ms. Blaska's complaint had omitted any explicit reference to the Fourth Amendment, moreover, it probably could have made no difference. See Lester v. Chicago, --F.2d ----, ---(7th Cir.1987), where the court said that "all excessive force in arrest claims should be analyzed under the same standard," and went on to hold that the proper standard "is a Fourth Amendment standard, and not a Fourteenth Amendment substantive due process standard."
 
 
 63
 It does not follow, however, that Plaintiff Blaska is entitled to a new trial simply because the district court spoke of actions that "shock the conscience" and used the words "substantive due process." The court gave the jury no definition or explanation of the latter phrase, and we have no reason to suppose that the jury had any better understanding of what "substantive due process" signifies that the average lawyer does. The expression seems, on its face, to be a contradiction in terms, and any intelligent layperson unfamiliar with Lochner v. New York, 198 U.S. 45 (1905), and its progeny could be forgiven for drawing a blank on its meaning. Much more easily grasped, we believe, is what the court told the jury in the first sentence of the paragraph in question: "a police officer may use force to carry out his duties, but may not use more force than necessary ...." That is an accurate statement of law, and one the jury could readily understand.
 
 
 64
 Although the sentence that followed might offend the ear of the legal purist, it is unlikely to have misled the jury. That "[e]very excessive use of force ... does not raise itself to the level of a substantive due process violation" is, at one level of analysis, a perfectly defensible proposition. The Supreme Court recently reminded us that the Court "has never held that every instance of use of 'unreasonable force' in effecting an arrest constitutes a violation of the Fourth Amendment," Oklahoma City v. Tuttle, 471 U.S. 808, 817 n. 4 (1985), and if not every use of excessive force constitutes a violation of the Fourth Amendment, it is not to be supposed that every use of excessive force rises to the level of a "substantive due process violation," assuming there is such a thing.
 
 
 65
 The context of the Supreme Court's dictum in Oklahoma City v. Tuttle is important. Immediately before it noted that the Court has never held that every arrest effected through unreasonable force violates the Fourth Amendment, the Court pointed out that the jury's verdict in favor of the policeman "must have been based upon a finding that he acted in 'good faith and with a reasonable belief in the legality of his actions.' " (The jury apparently had been given a "good faith immunity" instruction based on Pierson v. Ray, 386 U.S. 547, 557 (1967) ("[I]f the jury found that the officers reasonably believed in good faith that the arrest was constitutional, then a verdict for the officers would follow, even though the arrest was in fact unconstitutional."). See the Court of Appeals decision reported as Tuttle v. Oklahoma City, 728 F.2d 456, 458 (10th Cir.1984).) This suggests that if the district court had given the "reasonably necessary" charge requested by Ms. Blaska in the case at bar, the court ought also to have given an appropriate qualified immunity charge. In light of Anderson v. Creighton, 483 U.S. ----, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), we take it that such a charge would have told the jurors, in substance, that even if they did not think the degree of force used was reasonably necessary, the trooper in question would nonetheless be entitled to a verdict in his favor if they should conclude that a reasonable police officer facing the situation that confronted this trooper could reasonably, if erroneously, have considered such force justified.[2]
 
 
 66
 In the final sentence of the questioned paragraph in the district court's charge, the jury was told that "[a] Constitutional violation occurs if the use of force is so excessive or inappropriate as to shock the public conscience ...." As far as it goes, that statement is true. Moreover, it did not give the jury the erroneous impression that the only basis on which the jury could find for the plaintiff (assuming the existence of probable cause for the arrest) would be a finding that the use of force was such as "to shock the public conscience"--because the jury was told that it could also find for the plaintiff if it concluded that the use of force offended "the community sense of fair play and decency." That is a lower standard than the "shocks the conscience" standard, and it comes fairly close to the standard set forth in the Fourth Amendment itself. The average person, if asked whether the seizure of Ms. Blaska was "unreasonable," on the one hand, or in violation of "fair play and decency" on the other, would, we suspect, be had put to detect any meaningful difference between the two.
 
 
 67
 The defendant troopers' lawyer conceded, in his opening statement to the jury, that the seizure of Ms. Blaska's person violated the Constitution if it happened the way her lawyer said it did. (The account given by the plaintiff's lawyer in opening statement accurately stated what the testimony proved to be.) Had the jury believed Ms. Blaska's account, it is inconceivable that the court's charge could have led the jury to return a verdict for the defendants. The defendants won this case not because of any error in the charge, but because of Ms. Blaska's inability to convince the jury that the troopers were dissembling. The charge as a whole was informative, balanced, and fair to both sides. There is no reversible error here.
 
 III
 
 68
 Ms. Blaska's remaining assignments of error need not detain us long. She alleges that the district court erred in failing to give requested instructions to the effect that a police officer may not initiate a criminal proceeding without probable cause to believe that the person in question has committed the crime, and to the effect that it is unconstitutional for police officers to procure a prosecution by perjuring themselves. The first of these tendered instructions was deficient in that it made no reference to the element of malice, and the second (the tendered instruction on perjury) would not have told the jury anything it did not already understand. The jury was told that "the testimony of a police officer is not entitled to greater or lesser credibility than that of any [other] witness, merely because he's a police officer," and it was told that "[t]here is really no dispute that, at the time of this incident, the defendants were all police officers of the Department of Michigan State Police, acting in their official capacity." Thus, as the jury was instructed, the defendants were "acting under color of law," within the meaning of 42 U.S.C. Sec. 1983, and the jury was told that the plaintiff could recover if she established a deprivation of constitutional rights that was the natural consequence of the defendants' actions. The jury was further told that "a police officer may not use any force against a citizen if there's no probable cause to arrest that person for commission of a crime." If the jury believed the troopers, it would have had to think there was probable cause for Plaintiff Blaska's arrest and prosecution. If it believed Ms. Blaska, it would have had to think no such cause existed. Taking the charge as a whole, we do not believe that it could have left the jurors in any doubt that they could return a verdict for the plaintiff if they believed the troopers were lying and Ms. Blaska was telling the truth.
 
 
 69
 Next, Ms. Blaska argues that the district court erred in refusing to give a tendered instruction to the effect that a police officer has an affirmative duty to prevent other officers from committing illegal assaults. "Thus," the proposed instruction concluded, "if you find that Officer Fuentes unlawfully physically assaulted the plaintiff and that Officer Swabash did nothing to prevent it, you must hold the second officer liable as well." The jury did not find that either officer unlawfully assaulted the plaintiff, so any error in failing to give the charge was harmless. Moreover, as the defendants point out, neither the complaint, the plaintiff's opening statement, nor the evidence suggested that one of the troopers improperly failed to restrain the other.
 
 
 70
 The district court is said to have erred in excluding proffered evidence regarding prior incidents of misconduct by Troopers Fuentes and Swabash. Such evidence is only admissible where relevant, however, Fed.R.Evid. 402 and 405, and evidence of a person's bad character is generally not admissible for the purpose of proving that the person acted in conformity with that character on a particular occasion. Fed.R.Evid. 404(a). A court must consider whether the probative value of such evidence is substantially outweighed by the possibility that the jury will use it for an improper purpose. Fed.R.Evid. 403; Cullen v. Margiotta, 811 F.2d 698, 716-17 (2d Cir.), cert. denied, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987). We cannot say that the trial court abused its discretion in striking the balance as it did here.
 
 
 71
 Finally, the plaintiff says that the district court erred when, at the outset of the trial, it dismissed without prejudice a series of claims based on Michigan law. We find no abuse of discretion in the trial court's decision to remit the plaintiff to her remedies in state court, given the somewhat different legal standards applicable to the claims in question. As a practical matter, moreover, it is most unlikely that the jury could have found for the plaintiff on her state claims while finding against her on her federal claims.
 
 
 72
 The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 See, however, Justice v. Dennis, --F.2d ---(4th Cir.1987) (en banc), approving a "shocks the conscience" jury charge as "a rational, useful and widely accepted" method of focusing the jury's inquiry regarding the question whether the state actor has exceeded the bounds of privilege. Slip opinion at 7
 
 
 [2]
 Anderson teaches that a police officer is allowed a reasonable margin of error in making instantaneous calculations as to the reasonableness of a seizure and the reasonableness of its execution. It is possible, in other words, to find that a police officer "reasonably" acted unreasonably. See 97 L.Ed.2d at 533