836 F.2d 1348
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Joseph R. KUHAR, Plaintiff-Appellant,
v.
William HANTON, et al., Defendants-Appellees.
 No. 86-4110.
 United States Court of Appeals, Sixth Circuit.
 Jan. 8, 1988.
 
 Before WELLFORD and RALPH B. GUY, Jr., Circuit Judges, and HARVEY, Senior District Judge.*
 PER CURIAM.
 
 
 1
 Plaintiff, Joseph Kuhar, appeals the entry of summary judgment in favor of defendants in this civil rights action brought pursuant to 42 U.S.C. Sec. 1983. Plaintiff alleged that defendants used excessive force in effecting his arrest. The trial court found that plaintiff had been subject to a fourth amendment seizure, but that such seizure was reasonable and granted summary judgment to defendants. We reverse.
 
 I.
 
 2
 During the early morning hours of June 29, 1985, plaintiff left his apartment to go for a ride on his motorcycle. As he rode past a local club, plaintiff recognized the motorcycle of an acquaintance and decided to stop. Plaintiff and his acquaintance left the club approximately 45 minutes to an hour later and began drag racing their motorcycles on Lakeshore Boulevard.
 
 
 3
 During the race, a police car started to chase plaintiff. Rather than stopping, plaintiff tried to escape. Plaintiff explained that he was afraid of getting a ticket for reckless driving or drag racing and was worried about getting his license suspended for not having insurance on his motorcycle.
 
 
 4
 The chase started close to East 156th Street in Cleveland and proceeded west on Lakeshore Boulevard. Plaintiff then left Lakeshore and the chase continued through side streets. On Grovewood, which runs parallel to Lakeshore, plaintiff ran a stationary roadblock. The roadblock consisted of a police car in the middle of the street, which plaintiff avoided by going around it to his left. Thereafter, the chase returned to Lakeshore Boulevard. Throughout the chase, plaintiff's speed ranged from ten to seventy miles per hour. The entire chase lasted ten to fifteen minutes.
 
 
 5
 Plaintiff collided with a police car about a minute and a half to two minutes after the chase returned to Lakeshore. Just before the collision, plaintiff was heading westbound on the inside lane when he saw a car approaching in the eastbound lane. He described the incident as thus:
 
 
 6
 I was heading westbound, like I said, going through those three curves, and I was coming around the second curve, and I seen there was a car. The last curve's a real sharp curve, and I seen headlights of a car coming around the third curve, and there is a little straight-of-way, and we both lined up in the straight-a-way. There's a straight-of-way right there, and since we both had come out of curves, he hits his beams of his car--not the overhead lights but the high beams--and he made a left-hand turn over the center line in front of me, and I made a left-hand turn to try to avoid him, and my leg was smashed between the car and the bike. He made a left and I made a left to try to avoid him; so I got sandwiched in between the car and the bike.
 
 
 7
 (App. 107-108). Plaintiff also testified that he did not have time to stop the motorcycle before the accident. As a result of the accident, plaintiff suffered permanent damage to his right leg.
 
 
 8
 Plaintiff brought this action for damages under 42 U.S.C. Sec. 1983 against defendants City of Cleveland, the mayor, the chief of police, and two individually named police officers. Plaintiff alleged that the officers used unreasonable and unnecessary force in placing a police vehicle in the path of his motorcycle, causing plaintiff to collide with the police vehicle. Count I of plaintiff's complaint alleged fourth and fourteenth amendment claims against the individual officers for the use of excessive and unreasonable force. Count II alleged a claim against the mayor and police chief for subjecting "Plaintiff and other persons to a systematic pattern of conduct consisting of the use of unreasonable, unnecessary and deadly force in securing the arrests of fleeing misdemeanants." (App. 7). Count III alleged a claim against the city for failure to properly train and supervise officers, and for maintaining the policy or custom of using deterrent roadblocks and unreasonable, unnecessary, and deadly force in securing the arrests of fleeing misdemeanants. Defendants moved for summary judgment on all three counts.
 
 
 9
 In granting summary judgment, the trial court primarily relied on Galas v. McKee, 801 F.2d 200 (6th Cir.1986). In that case, police officers began chasing the driver of an automobile who failed to stop when signalled to do so. The pursuit, which reached speeds of 100 miles per hour, ended when the driver of the car lost control and ran off the roadway. The driver of the car, who turned out to be a thirteen year old minor, was seriously injured.
 
 
 10
 The plaintiff in Galas relied on Tennessee v. Garner, 471 U.S. 1 (1985), in arguing that the continuance of a high-speed pursuit of a traffic offender until the pursuit is terminated by a crash of the offender's vehicle constituted an unreasonable seizure in violation of the fourth amendment. The Galas court noted that this contention required analysis of two factors: (1) whether there was a seizure; and (2) whether it was an unreasonable method of seizing traffic offenders. 801 F.2d at 202.
 
 
 11
 Because the officers in Galas had not exercised physical force, nor had they restrained the minor by a show of authority, the court determined that no seizure had occurred. Id. at 203. Assuming, however, that plaintiff had been seized, the court went on to decide whether a high-speed pursuit by police officers is a reasonable method of seizing traffic offenders. The court stated:
 
 
 12
 In order to determine the reasonableness, and thus the "constitutionality of [the method of] seizure '[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.' " ... Courts are, however, "hesita[nt] to declare a police practice of long standing 'unreasonable' if doing so would severely hamper effective law enforcement."
 
 
 13
 801 F.2d at 203 (citations omitted). The court determined that the use of high-speed pursuits by police officers was not an unreasonable method of seizing traffic violators. Id.
 
 
 14
 In applying Galas here, the district court first determined that the officers' alleged movement of their car in front of the oncoming motorcycle constituted a physical "restraint," and thus a "seizure" under the fourth amendment. Thus, unlike Galas, the court concluded that there was a seizure. The court then turned to the reasonableness inquiry.
 
 
 15
 In finding that the seizure was reasonable, the court rejected plaintiff's argument that the forced collision of the police car and his motorcycle distinguished his case from Galas. Instead, the court concluded that the conduct of the police officers in attempting to stop the plaintiff, a traffic violator who had eluded police in a high speed chase, was not reasonable under the fourth amendment. Furthermore, the trial court held that since the seizure was reasonable under the fourth amendment, plaintiff's fourteenth amendment substantive due process claim failed as well. Because the court found the officers' conduct to be reasonable, it necessarily followed that their conduct could not "shock[ ] the conscience." Rochin v. California, 342 U.S. 165, 172 (1952).
 
 II.
 
 16
 Allegations of brutality by law enforcement personnel apprehending a suspect or effecting an arrest have been historically analyzed in terms of fourth amendment seizures and deprivations of liberty interests under the fourteenth amendment. If sufficiently egregious, a deliberate use of excessive force in this context can implicate the substantive fourth amendment guarantee against unreasonable seizures, the substantive due process right to be free from abusive governmental conduct offensive to human dignity or both. See, e.g., Tennessee v. Garner, 471 U.S. 1; Wilson v. Beebe, 770 F.2d 578 (6th Cir.1985) (en banc).[1]
 
 
 17
 Turning first to plaintiff's fourth amendment claim, we believe the trial court erred in finding Galas and the instant case to be indistinguishable. In applying the balancing test spoken of in Galas, the court concluded on those facts
 
 
 18
 that the use of high-speed pursuits by police officers is not an unreasonable method of seizing traffic violators. The extent of the intrusion is minimal. Without question highspeed pursuits place the suspect, the officer, and the public in general at risk of death or serious bodily injury. In that respect high-speed pursuits are no different than the use of firearms to apprehend fleeing suspects. However, it is the intrusiveness of the officer's conduct which must be weighed. By engaging in high-speed pursuits, without more, police use absolutely no force.
 
 
 19
 801 F.2d at 203 (emphasis added). Clearly, it cannot be said that no force is employed when a police vehicle is placed in the path of an oncoming vehicle so that the police vehicle cannot be avoided without collision.
 
 
 20
 In this case, plaintiff has alleged that the police car intentionally blocked his path in such a way as to cause a collision in order to stop him. This is not a case where a fleeing traffic offender is given the choice to stop or run a roadblock, and makes that choice at his own risk, i.e., Chesney v. Hill, 813 F.2d 754 (6th Cir.1987). As noted in Galas, high-speed pursuits are akin to the use of firearms to apprehend fleeing suspects, 801 F.2d at 203, and the ultimate question is whether excessive force was used to stop a fleeing traffic offender.
 
 
 21
 Factors relevant to assessing disproportionate use of force include, but are not limited to, the need for the force, the degree of force applied, the injuries inflicted, and totality of the circumstances surrounding the use of the force. Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.), cert. denied, 414 U.S. 1033 (1973). Here, the officer's movement of his vehicle in the path of plaintiff when he was so close as to create an immediate collision and significant injury, if proven, could be found against the backdrop of the totality of the circumstances to constitute unreasonable force in the attempt to apprehend this plaintiff.[2] Accordingly, we think the trial court erred in granting summary judgment on the basis of Galas at this juncture when little or no discovery had been undertaken.
 
 III.
 
 22
 Because the trial court relied on this finding of reasonable seizure in dismissing plaintiff's fourteenth amendment claim, this ruling must also be reversed.
 
 
 23
 Some intrusions by police officers upon a citizen's bodily integrity may be of such a magnitude to "shock[ ] the conscience." See Rochin, 342 U.S. at 172. Intrusions of this type violate the due process clause of the fourteenth amendment and, hence, are actionable under section 1983. Wilson v. Beebe, 770 F.2d at 582-83. In determining if a police officer's conduct rises to the level of a constitutional deprivation, the same factors listed above are relevant. Lewis v. Downs, 774 F.2d 711 (6th Cir.1985).
 
 
 24
 Defendant argues that summary judgment may be affirmed because plaintiff only alleged that defendants used "bad judgment" in stopping him by blocking the road with their police car, and that negligent conduct is insufficient to result in a substantive due process violation. Apparently, during his deposition, plaintiff at one time stated that the officers used bad judgment in stopping him. We reject this argument for two reasons.
 
 
 25
 First, we do not believe that plaintiff's one-time comment that the officers used bad judgment translates into an allegation that they simply acted negligently. Plaintiff has never alleged negligent conduct, but has consistently spoken of intentional conduct. We do not think that this is the type of argument which lends itself to resolution via a summary judgment motion.
 
 
 26
 Secondly, under our ruling in Nishiyama v. Dickson County, Tenn., 814 F.2d 277 (6th Cir.1987) (en banc), reckless indifference to the risk posed by a police officer's actions is sufficient to establish a violation of substantive due process under section 1983. Id. at 283.[3] We cannot say on the state of the record at this time that there is no genuine dispute of material fact on this issue. Summary judgment was thus inappropriate on this issue.
 
 IV.
 
 27
 Defendant also argues that summary judgment may be affirmed because the officers are entitled to qualified immunity. Defendants contend that because a "highly respected and learned senior United States district judge" found that their conduct was reasonable, it establishes that reasonable officers could disagree as to whether such conduct amounted to a tort of constitutional dimension such that the individual officers are entitled to qualified immunity.[4] We disagree.
 
 
 28
 It has long been settled that a police officer is prohibited from using excessive force to effect an arrest or seizure. While this specific fact situation may not have arisen, that is not required in order to identify conduct which a reasonably competent officer would recognize as unlawful. Malley v. Briggs, 475 U.S. 335, ----, 106 S.Ct. 1092, 1096 (1986). Garner, decided by the Supreme Court three months before the conduct in question here, clearly establishes that deadly force cannot be used to stop non-violent fleeing felons. Plaintiff has alleged that defendants used deadly, or at least excessive, force against him. Accordingly, we do not believe that on the record as it now stands defendant officers are entitled to qualified immunity.[5]
 
 
 29
 The remainder of the arguments presented by defendants for affirming the entry of summary judgment, which were not addressed by the district court, we do not reach because of the posture of this case. The trial court stayed discovery in this case, and none has ever been conducted. We believe the remainder of defendants' arguments should first be presented to and ruled upon by the trial court.
 
 
 30
 We therefore REVERSE and REMAND for further proceedings consistent with this opinion.
 
 WELLFORD, Circuit Judge, concurring:
 
 31
 I concur in the disposition of this difficult case. I write separately only to indicate my views concerning conduct "shocking to the conscience of the court" and other questions raised herein.
 
 
 32
 Plaintiff had been to the North Coast Night Club, drinking for about an hour late at night, and was drag racing with another motorcyclist inside the City of Cleveland at the time of the eposide in controversy. He was trying to escape from the police because he was engaged in various illegal acts including having no insurance on the motorcycle, having a suspended license, and engaging in reckless, risky and unlawful drag racing without a helmet, dangerous not only to himself but to others who might come into contact with him. He had continued to evade a number of police vehicles seeking to stop him for up to fifteen minutes, travelling at speeds up to 70 miles per hour on Lakeshore Boulevard and a number of nearby city streets. He had avoided at least one roadblock set up to stop him in respect to his criminal conduct and to keep him from escaping arrest. At one point in his deposition, Kuhar stated that the police car which he struck turned "about 25 yards[1] in front of me." He also indicated that he did not believe the police intended to cause him severe injury but rather to stop him. He described what he thought was a city policy: "using reasonable force to stop a fleeing misdemeanant."
 
 
 33
 I note initially that there is some question concerning whether Cleveland police violated any city policy by acting as they did. It was Kuhar's deposition opinion that the police officers involved used "extremely unreasonable" force, but he did not believe the defendant city had a policy of having "its police officers to cut people off when they're too close to avoid an accident and they're trying to escape." He testified that the individual defendant officers violated the city's policy of using "reasonable force" in respect to fleeing misdemeanants. This was contrary to his response to Interrogatory 15 submitted by defendants:
 
 
 34
 15. Set forth each fact on the basis of which plaintiff alleges, in paragraph 20 of the Complaint, that "the use of a deterrent block by driving police vehicles in front of a person fleeing arrest after having committed a misdemeanor was [at all times relevant to the Complaint] the official policy or custom of ... the City of Cleveland."
 
 
 35
 Plaintiff was injured when he struck such a deterrent block set up by Police Officers of the Cleveland Police Force. Police Officers of the Cleveland Police Force carry out the policy of the City of Cleveland.
 
 
 36
 On remand, the district court should determine if proof of such a city policy is produced, because no policy has been presented here. Plaintiff has apparently demonstrated no proof to contradict his deposition statement that the police officer operating the vehicle in question was violating the City of Cleveland's policy by allegedly turning in front of him. A police officer's conduct, even if negligent or grossly negligent, not in accordance with established police department policy or practice, does not bind or render liable the city or city officials not directly involved in the offending action. See Monell v. Department of Social Services, 436 U.S. 658 (1978). Absent proof of a municipal policy condoning the police officer's action this case seems ripe for dismissal of the city, its mayor and chief of police.
 
 
 37
 In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.
 
 
 38
 Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.), cert. denied, 414 U.S. 1033 (1973). The district court should look to the efforts taken previously to effect Kuhar's custody in light of the nature of his continuing conduct and elusive activity. As we stated in Jones v. Sherrill, 827 F.2d 1102, 1106 (6th Cir.1987), "[t]he facts alleged in support of the legal conclusion of gross negligence must be sufficient to charge the officials with outrageous conduct" in order to find liability, based on the standards of Rochin v. California, 342 U.S. 165 (1952), and Nishiyama v. Dickson County, 814 F.2d 277 (6th Cir.1987) (en banc).
 
 
 39
 The circumstances of this case are different from the facts of Tennessee v. Garner, 471 U.S. 1 (1985). In Garner, action was brought against City of Memphis police for firing their weapons and killing a fifteen year old attempting to flee from the scene of a burglary. Young Garner was ignoring the shouts of the police to stop and the police were "reasonably sure" he was unarmed. Because the "suspect pose[d] no immediate threat to the officer and no threat to others," at the time of the shooting the Court held that use of deadly force was not constitutionally justified under those circumstances. 471 U.S. at 11 (emphasis added). The focus in Garner was upon the fact that the fleeing suspect was unarmed and not dangerous, not a threat to the police, nor also to others at or near the scene.
 
 
 40
 The district court should consider whether Kuhar, on the other hand, was a threat to himself and to others, by being "armed" with a motorcycle hurtling through city streets at dangerous speeds, and thus whether Kuhar might kill or seriously injure anyone who innocently happened into his path. Use of reasonably necessary force to stop an immediate risk and present danger to citizens and bypassers should be carefully examined and/or contrasted with the facts and circumstances involved in Tennessee v. Garner, 471 U.S. 1 (1985). See also Galas v. McKee, 801 F.2d 200 (6th Cir.1986) and Lester v. City of Chicago, 830 F.2d 706 (7th Cir.1987).
 
 
 41
 To summarize, the district court should consider and determine whether there was unreasonable force used after first providing plaintiff an opportunity to develop further proof regarding the circumstances of his collision with the police vehicle. At that time the court should also decide whether the police were acting within the scope of their limited immunity. Summary judgment for defendants was inappropriate in light of disputed facts about how far in front of plaintiff's motorcycle the police vehicle turned and whether there was an official policy directing this kind of action.
 
 
 
 *
 Honorable James Harvey, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 We note that the Seventh Circuit has recently decided that in excessive force arrest cases the only analysis should be under the fourth amendment and not the fourteenth amendment. Lester v. City of Chicago, --F.2d ----, No. 86-2008 (7th Cir. Sept. 17, 1987). We do not address this issue since it is not specifically raised by the parties nor is its resolution necessary to our decision in this appeal
 
 
 [2]
 We emphasize that we are not holding that if it is proven that the officers intended the collision to occur this would, ipso facto, constitute unreasonable force. We are only saying that the trial judge erred when he found as a matter of law that this conduct is not unreasonable
 
 
 [3]
 We again want to be careful to make clear that we express no judgment here as to whether this conduct could meet the Nishiyama standard. Further, we note that in Jones v. Sherrill, 827 F.2d 1102 (6th Cir.1987), another panel of this court found in a police pursuit that:
 The government conduct in pursuing Sherrill does not rise to the level of gross negligence and outrageous conduct necessary to sustain a section 1983 claim under Nishiyama. Nishiyama did not hold that a mere allegation of gross negligence or aggravated negligence would always be enough to withstand a motion to dismiss. Negligence does not become "gross" just by saying so. If the courts are to make any sense of the distinction between gross negligence and simple negligence, we must ensure that gross negligence is something more than simple negligence "with the addition of a vituperative epithet." Wilson v. Brett, 11 M. & W. 113, 152 Eng.Rep. 737 (Ex. 1843). The facts alleged in support of the legal conclusion of gross negligence must be sufficient to charge the government officials with outrageous conduct or arbitrary use of government power. The high speed pursuit alleged in Jones's complaint is not sufficient to state a claim under Nishiyama.
 Sherrill, 827 F.2d at 1106.
 
 
 [4]
 Carried to its logical conclusion, this argument would preclude appellate review of any finding of qualified immunity
 
 
 [5]
 The trial judge did not really address the issue of qualified immunity and nothing herein is intended to preclude consideration of this issue at an appropriate time
 
 
 [1]
 In his affidavit in opposition to defendants' motion for summary judgment, plaintiff stated the police turned "approximately 25 feet in front of me" after flashing their high beam lights, "momentarily blinding me."