

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. WR-65,137-05

### EX PARTE CLINTON LEE YOUNG, Applicant

### ON APPLICATION FOR WRIT OF HABEAS CORPUS
### IN CAUSE NO. CR-27181-E IN THE 385TH JUDICIAL DISTRICT COURT
### MIDLAND COUNTY

*Per curiam.*

### O P I N I O N

This is a subsequent application for a writ of habeas corpus in a capital case filed

pursuant to the provisions of Texas Code of Criminal Procedure Article 11.071, § 5.[1]

Applicant was convicted of capital murder and sentenced to death in April 2003.

We affirmed his conviction and sentence on direct appeal. *Young v. State*, No. AP-

74,643 (Tex. Crim. App. Sept. 28, 2005) (not designated for publication).

---

[1] Unless otherwise indicated, all references to Articles are to the Texas Code of Criminal Procedure.

In March 2005, Applicant filed his initial postconviction application for a writ of habeas corpus (our -01) in the trial court, raising fourteen claims. In January, March, and June 2006, Applicant filed pleadings that we determined to be his first subsequent writ application (our -02), which raised nine additional claims. This Court denied relief on Applicant's initial postconviction application for writ of habeas corpus and dismissed his first subsequent application as an abuse of the writ. *Ex parte Young*, Nos. WR-65,137-01 and WR-65,137-02 (Tex. Crim App. Dec. 20, 2006) (not designated for publication).

Applicant filed his second subsequent habeas application (our -03), in which he raised four claims, in the trial court in March 2009. This Court dismissed two of the claims as procedurally barred but found that two claims met the requirements of Article 11.071 § 5, and we remanded those claims to the trial court. *Ex parte Young*, No. WR-65,137-03 (Tex. Crim. App. June 3, 2009) (not designated for publication). During the remand, Applicant waived one of the remanded claims. When the case returned to this Court, we denied relief on the remaining remanded claim and dismissed the waived claim. *Ex parte Young*, No. WR-65,137-03 (Tex. Crim. App. June 20, 2012) (not designated for publication).

Applicant filed his third subsequent habeas application (our -04) in the trial court on October 2, 2017, raising eight claims. We found that Applicant's first claim, in which he contends that the State unknowingly used false or misleading testimony at trial, met the requirements of Article 11.071 § 5, and we remanded that claim to the trial court for consideration. *Ex parte Young*, No. WR-65,137-04 (Tex. Crim. App. Oct. 18, 2017) (not

designated for publication).

While the case was on remand, Applicant filed his fourth subsequent habeas application (our -05, which is the subject of this opinion) in the trial court on August 14, 2020. In the application, Applicant presents three claims based on newly discovered information that one of the prosecutors representing the State in Applicant's capital murder case was also employed as a "judicial clerk" for the trial judge during Applicant's trial and initial postconviction proceedings. We concluded that Applicant's claims met the requirements of Article 11.071 § 5, and we remanded all three claims to the trial court for consideration. *Ex parte Young*, Nos. WR-65,137-04 and WR-65,137-05 (Tex. Crim. App. Dec. 16, 2020) (not designated for publication).

## RELEVANT FACTS

The trial court conducted a one-day evidentiary hearing via Zoom. Four witnesses testified remotely: the current Midland County District Attorney, the chief appellate prosecutor, the County Attorney for Midland County, and one of Applicant's appointed trial attorneys. Forty-three exhibits were admitted at the writ hearing; most were stipulated to by the parties, all were admitted without objection. The judge who presided over Applicant's capital murder trial, Judge John Hyde, passed away in January 2012, and thus was not available to testify. Further, the record reflects that the prosecutor who was alleged to have been paid as Judge Hyde's judicial clerk, Weldon Ralph Petty, refused to appear to testify at the writ hearing, first expressing health concerns related to possible COVID-19 exposure and later invoking his Fifth Amendment privilege against

self-incrimination. The habeas judge found that Petty was "unavailable to testify as a witness" due to his Fifth Amendment invocation.

The evidence admitted at the writ hearing demonstrates that Petty began working for the Midland County District Attorney's Office as a part-time prosecutor in 2001. He became a full-time prosecutor in 2002 and worked as a full-time prosecutor for the Midland County DA's Office until his retirement in June 2019.

In 2002, when Petty began to work full-time at the DA's office, Judge Hyde sought an opinion from Russell Malm, the County Attorney for Midland County, about whether Petty could receive pay for doing work for the district judges on habeas corpus cases in addition to his regular salary as an assistant district attorney. The concern was the constitutional prohibition against employees receiving additional compensation for work for which they were already being paid. Because Petty's work for the judges was done on his own time, and not as part of his duties at the DA's office, Malm concluded that Petty's work for the judges was completely separate from his job as an assistant district attorney, and he could be paid by the county for that work. Malm made it clear at the writ hearing that his opinion was only about payment, and not about whether the dual employment would create an ethical conflict of interest.

The evidence also establishes that from 2001 through 2014 and again in 2017 and 2018, Petty was paid by the Midland County district court judges—including Judge Hyde—for "legal work" performed in connection with postconviction writs of habeas corpus. When a habeas application was filed, the judge of the convicting court assigned

the writ to Petty. He then reviewed the file, performed any necessary research, and submitted a recommendation and a proposed order with findings of facts and conclusions of law to the assigning judge.

The evidence further shows that the District Attorney who hired Petty as a part-time prosecutor and later a full-time prosecutor, Al Schorre, knew of Petty's employment by the district court judges, as did the First Assistant District Attorney, Teresa Clingman, who became District Attorney after Schorre. The evidence indicates, however, that the other prosecutors in the office who were involved in Applicant's trial and subsequent postconviction proceedings were not aware of Petty's judicial employment.

Midland County District Attorney Laura Nodolf, who was elected in 2016, discovered Petty's judicial employment during the 2019 budget process after Petty's retirement. She had requested money for an intake attorney and contacted the county treasurer to see if the position had been approved. The treasurer sent Nodolf a report in the form of an Excel spreadsheet with all the departments' requests and approvals. In the report, Nodolf discovered a line-item payment from the district courts to Petty. Nodolf's ensuing investigation revealed that Petty had been paid for working on numerous postconviction writs by multiple judges while he was working as a prosecutor for the Midland County DA's Office. Petty confirmed to Nodolf that he had been getting paid by the district court judges while working as a prosecutor. He maintained that he worked for the judges during off hours at his home, not while he was at the office.

On discovering Petty's judicial employment, Nodolf went to Erik Kalenak, the chief appellate prosecutor who assisted Petty with, and later assumed responsibility for, handling Applicant's postconviction habeas proceedings, to discern if he was aware of Petty's judicial employment. Kalenak was not and was "shocked" when he learned of it from Nodolf. Nodolf and Kalenak realized that Petty might have been paid by the judges for work on Applicant's capital murder case, and Kalenak immediately informed Applicant's habeas attorney of the discovery of Petty's judicial employment. Kalenak then filed a motion to recuse the Midland County DA's Office from Applicant's case, which was granted. The DA's office then sent letters to each of the defendants for whom Petty had billed the district court judges for work on postconviction writs—some 300 plus defendants—to inform them of the "ethical situation."

The evidence at the writ hearing also establishes that, although Schorre and Clingman were the primary prosecutors in Applicant's capital murder trial, Petty was actively part of the prosecution team. Petty was "basically the legal advisor to [the] team that was prosecuting the case" and "probably drafted just about every single motion in that case . . . that the prosecution filed." He also appeared in court multiple times during the trial proceedings to argue particular legal issues.

According to exhibits admitted at the writ hearing, during Applicant's capital murder trial proceedings—specifically, from the period beginning with Applicant's capital murder indictment on February 7, 2002, through the denial of Applicant's motion for new trial on June 20, 2003—the district court judges collectively paid Petty $16,700.

The exhibits further show that Judge Hyde paid Petty $7,500 while he was presiding over Applicant's capital murder trial proceedings.[2]

In addition, the exhibits and testimony establish that Petty represented the State during Applicant's initial 11.071 and first subsequent writ proceedings before Judge Hyde. The exhibits also show that Judge Hyde paid Petty $1,500 for legal work performed in connection with Applicant's initial postconviction application for writ of habeas corpus. This combined evidence demonstrates that, in his role as prosecutor, Petty opposed habeas relief at the writ hearings while at the same time, in his role as judicial clerk to Judge Hyde, he drafted the order recommending the denial of Applicant's initial 11.071 writ application.

After the Zoom writ hearing, Applicant submitted proposed findings of fact and conclusions of law to the habeas judge. The State filed a document that contained two sets of the State's proposed findings of fact and conclusions of law. Both sets conceded Petty's judicial employment while prosecuting Applicant—and the impropriety of it—but proposed alternative dispositions: version "A" recommended denying habeas relief; version "B" recommended granting habeas relief. After some discussions, the habeas judge adopted Applicant's proposed findings and conclusions *in toto*, making no additional findings or conclusions.

---

[2] According to the evidence in the record before this Court, over the course of Petty's judicial employment, the district court judges collectively paid Petty at least $132,900. Judge Hyde paid Petty at least $64,100.

After the case returned to this Court, the parties filed an agreed stipulation and request for judicial notice, which asked this Court to take judicial notice of the Texas Supreme Court's order accepting Petty's resignation from the State Bar of Texas in lieu of disciplinary action. In the order, the Texas Supreme Court "deem[ed] the professional misconduct detailed [against Petty] conclusively established for all purposes." That misconduct included that Petty

> was employed full-time as an appellate attorney with the Midland County District Attorney's Office, while Petty was also being paid by the District Judges of Midland County to work on writs in cases to which he was assigned in the District Attorney's office. These facts establish violations of Texas Disciplinary Rules of Professional Conduct, Rule 1.06(b)(2).

*See* Tex. Disciplinary Rules Prof'l Conduct R. 1.06(b)(2) (providing that, with exceptions not applicable here, "a lawyer shall not represent a person if the representation of that person reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities . . . to a third person or by the lawyer's or law firm's own interests.").

**ANALYSIS**

Underlying all three claims in the instant writ application (our -05) is Applicant's contention that Petty's judicial employment while simultaneously prosecuting him—and the State's failure to disclose it—violated his due process rights to an impartial judge and a fair trial.

In Claim 1, Applicant alleges that his right to an impartial judge was violated because Judge Hyde was actually biased or, if not, was presumptively biased against him

due to the judge's employment of Petty while Petty was representing the State at trial and in the postconviction proceedings before Judge Hyde. *See Buntion v. Quarterman*, 524 F.3d 664, 672 (5th Cir. 2008).

In Claim 2, Applicant contends that his right to a fair trial was violated because Judge Hyde was constitutionally disqualified, statutorily disqualified, and subject to disqualification and recusal under the Rules of Civil Procedure because he employed Petty while Petty represented the State in his court. *See* TEX. CONST. art. 5, § 11; Art. 30.01; TEX. R. CIV. P. 18b(a)(1), (b)(1) & (5).

In Claim 3, Applicant asserts that the State violated his right to a fair trial because the prosecutorial misconduct pervading Applicant's case—including Petty's simultaneous employment for the judge presiding over Applicant's trial proceedings and the State's failure to disclose it—was misconduct that "shock[s] the conscience." *See Rochin v. California*, 342 U.S. 165, 172 (1952).

In its signed order, the habeas court concluded "that Applicant Clinton Young's structural due process rights were violated" by Judge Hyde's employment of Petty as a judicial clerk while Petty was prosecuting Applicant for capital murder before Judge Hyde. The habeas judge recommends that relief be granted.

Although we agree with the habeas judge's ultimate conclusion that relief be granted, we decline to adopt the habeas judge's findings of fact and conclusion of law. We have reviewed the record with respect to Applicant's claims. The undisputed evidence in the record establishes that an attorney working as a paid judicial clerk for the

judge presiding over Applicant's capital murder proceedings simultaneously represented the State against Applicant during his trial and his initial postconviction proceedings before that same judge. At the writ hearing, Assistant District Attorney Kalenak aptly described the problem with Petty's dual role: "[Y]ou can't serve two masters in that way. You . . . [can] either be an impartial person that the judges are consulting, or you [can] be . . . an advocate with the District Attorney's Office. You . . . can't do both. I mean, that's like professional responsibility 101." The record demonstrates that Petty was "serving two masters." Judge Hyde was one of the "masters," and he allowed his "servant," his paid judicial clerk, to represent one of the parties appearing before him in a contested legal matter—namely, Applicant's capital murder trial.

"A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). Further, "fundamental to the judiciary is the public's confidence in the impartiality of our judges and the proceedings over which they preside." *United States v. Jordan*, 49 F.3d 152, 155 (5th Cir. 1995); *see, e.g.*, *Metts v. State*, 510 S.W.3d 1, 8 (Tex. Crim. App. 2016) ("Regardless of any actual bias harbored by [the trial court judge], the appearance of impropriety is palpable."). Almost a century ago, the Supreme Court explained that "[e]very procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear, and true between the State and the accused denies the latter due process of law." *Tumey v. Ohio*, 273 U.S. 510, 532 (1927). The Supreme Court later recognized that "[s]uch a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their

very best to weigh the scales of justice equally between contending parties." *Murchison*, 349 U.S. at 136. "But to perform its high function in the best way 'justice must satisfy the appearance of justice.'" *Id.* (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954)).

Judicial and prosecutorial misconduct—in the form of an undisclosed employment relationship between the trial judge and the prosecutor appearing before him—tainted Applicant's entire proceeding from the outset. As a result, little confidence can be placed in the fairness of the proceedings or the outcome of Applicant's trial. The taint, the record shows, continued through Applicant's postconviction proceedings and persisted until the revelation in 2019 of Petty's judicial employment upon inadvertent discovery by District Attorney Nodolf. The evidence presented in this case supports only one legal conclusion: that Applicant was deprived of his due process rights to a fair trial and an impartial judge.

## CONCLUSION

Based on our review of the record, we grant Applicant's request for relief, vacate Applicant's judgment of conviction, and order that Applicant be remanded to the custody of the Sheriff of Midland County to answer the charge set out in the indictment.

Delivered: September 22, 2021
Do Not Publish