57 Cal.Rptr.3d 136 (2007)
149 Cal.App.4th 274
The PEOPLE, Plaintiff and Respondent,
v.
Travis Lee HERNDON, Defendant and Appellant.
No. B183711.
Court of Appeal of California, Second District, Division Seven.
April 3, 2007.
As Modified on Denial of Rehearing May 2, 2007.
*137 Carlo Andreani, San Francisco, under appointment by the Court of Appeal, for Defendant and Appellant.
Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves, Chief Assistant Attorney General, Pamela C. Hamanaka, Senior Assistant Attorney General, Robert F. Katz, Michael J. Wise and Robin Davis, Deputy Attorneys General, for Plaintiff and Respondent.
Certified for Partial Publication.[*]
JOHNSON, Acting P.J.
This case requires us to decide whether the trial court violated a defendant's right to due process of law when, at the court's direction, five sheriffs deputies wrestled the defendant to the ground, pried open his clenched fists and took his fingerprints. We conclude the use of such brutal force to compel the defendant's obedience to a court order he submit to fingerprinting violated the defendant's right to due process of law and the trial court's duty to provide for the orderly conduct of proceedings before it. We are convinced beyond a reasonable doubt, however, that under the circumstances of this case the trial court's error was not prejudicial. Finding no merit in defendant's remaining issues on appeal, we affirm the judgment.

FACTS AND PROCEEDINGS BELOW
A jury convicted Travis Lee Herndon of one count of armed robbery and two counts of assault with a firearm. We briefly summarize the evidence and relevant trial court proceedings.
Prior to trial Herndon asked the trial court to relieve his counsel, a public defender, and appoint a private attorney to represent him.[1] The court denied that motion. Herndon subsequently asked the court to relieve his counsel and allow him to represent himself.[2] The court granted the motion and appointed standby counsel.
As we discuss more fully below, the trial began and ended with controversy.
The first alleged irregularity occurred in the trial court's voir dire of the second prospective juror. Reacting to the juror's *138 expression of doubt he could be fair and impartial the trial judge commented: "I know many of you are trying to get out of jury duty here" and admitted her own father-in-law and other relatives and friends try to do the same thing.
Once the jurors were selected they heard the following evidence.
On the morning of the robbery Donna Dang arrived at her beauty salon at approximately 8:45 a.m. Normally Dang did not open the salon until 10:00 but on this morning an African American man wearing dark jeans trousers and a black shirt entered at approximately 8:50 and asked for a manicure, pedicure and shoulder message. Dang and the man went into the "facial room" where the man took off his shirt and Dang began the massage. Dang testified she believed the man had a tattoo but she was not sure.
After Dang had massaged the man for a few minutes the man pulled a gun from his pants pocket, pointed it at Dang and asked her where her money was. The man then closed the door to the room using the door handle. He took Dang's cell phone and told her to stay inside the room. Leaving Dang in the "facial room" the man went into the main salon. Dang could hear noises which led her to believe the man was searching in the salon. When Dang heard the man leave she went into the salon. She immediately noticed drawers were open and the room was in disarray. Her purse containing over $1,000 was missing.
A delivery man, Than Ly, arrived at the salon just as a man quickly walked out. Ly described the man as wearing black shorts and carrying a dark jacket or sweater with a woman's purse underneath. The next moment Ly heard Dang screaming about a robbery and pointing at the man who was now running away. Ly gave chase calling for him to stop. Ly halted when the man turned around and pointed a gun at him. He then went back to the salon and called the police. Ly could not remember seeing a tattoo.
Leonel Platero, who owned the business next door to Dang's salon, also heard Dang shouting and went outside his store. He saw a shirtless African-American man run out of the salon and down the street. Platero joined Ly in the chase but stopped when the man pointed something at him.
The police arrived at the salon a few minutes after the robbery. They established a perimeter based on their estimate of how far the suspect could have gone on foot since the robbery and then fanned out looking for a man matching the description given by Dang, Ly and Platero. An officer flying over the perimeter in a helicopter saw a man in dark pants crawling in tall grass. Believing this man to be the suspect in the robbery the officer used his loudspeaker to order the man to surrender. The suspect refused. Instead, he got up and ran, jumped fences, looped underneath a carport and disappeared.
Twenty to thirty minutes later, officers on the ground saw defendant Herndon jump out of the back window of a garage. Herndon went over a fence, climbed down a ladder onto a parking lot, broke free from officers, went back up the ladder, pushed away officers attempting to grab him, jumped over a chain link fence, fell, got up and ran back toward the garage. A K-9 handler sent his dog after Herndon. The dog bit Herndon and took him to the ground where he was placed in custody approximately a quarter mile from Dang's salon. Herndon had $109.29 in his possession. The police never recovered Dang's cell phone, purse or money or the gun used in the crime.
The police showed a handcuffed Herndon to Dang in the field. Dang identified *139 Herndon as the man who had robbed her. She noted, however, he now wore different clothingblue jeans and a white shirt instead of dark trousers and a black shirt. Later, in a lineup, Platero identified Herndon as the man he saw running from Dang's salon. Ly picked out someone else. At trial, both Dang and Platero identified Herndon as the robber.
With the assistance of five sheriffs deputies Herndon's fingerprints were forcibly taken during the trial outside the presence of the jury. A fingerprint expert testified the print of a left thumb taken from the door handle of the "facial room" at Dang's salon matched the print of Herndon's left thumb.
Herndon did not testify orally but displayed the tattoos on his upper body to the jury.
The jury convicted Herndon on all counts and found he had suffered two prior serious felony convictions. He filed a timely appeal.

DISCUSSION

I. TAKING HERNDON'S FINGERPRINTS BY FORCE VIOLATED HIS RIGHT TO DUE PROCESS AND THE TRIAL COURT'S DUTY TO PROVIDE FOR THE ORDERLY CONDUCT OF PROCEEDINGS BEFORE IT.
On the morning of the fourth day of trial, outside the jury's presence, the court stated on the record it had ordered Herndon to be fingerprinted. This prompted a strenuous objection from Herndon. "[They're] not taking my prints," he declared. He further asserted: "[The prosecution's] had that booking print since last week. [They're] not taking my print. They had my print already. They printed it." The trial court responded: "You don't have the right to refuse printing. I have these deputies here." To this, Herndon retorted: "They can do what they want. We can tear this courtroom up, your honor, with all due respect to the justice system. But for them to take my prints forcefully, that's how they gonna have to get it. We can get cracking."
The prosecutor attempted to defuse the situation suggesting options other than forcibly fingerprinting Herndon. These options included Herndon stipulating his fingerprints were found in the facial room of Dang's salon (Herndon rejected this option), instructing the jury it could consider Herndon's refusal to be fingerprinted as evidence of his consciousness of guilt[3] or calling a witness to prove Herndon's fingerprints are on his booking card. The prosecutor told the court she would "prefer" the latter option to having the deputies forcibly take Herndon's prints in the courtroom. The trial court agreed to allow the prosecutor to call her witness.
Later that morning the prosecutor called a fingerprint expert who testified the left thumbprint on Herndon's booking card matched the left thumbprint found at Dang's salon. On cross-examination Herndon got the expert to admit he could not say for sure the print recovered at Dang's was Herndon's because he did not roll the print on Herndon's booking card and had not personally rolled Herndon's prints to compare them with the print from Dang's. The trial court sustained Herndon's objection to the admission of the booking card as evidence of Herndon's fingerprint on the ground the prosecution had not shown *140 the thumpprint on the booking card was Herndon's.
The prosecutor then asked for leave to call another witness after the lunch recess who could lay a foundation for the fingerprint comparison. The court initially agreed to allow the prosecutor to call this witness but then commented: "I think it would have been a lot easier to roll his prints." The prosecutor stated: "If your honor wants to compel him now, I won't object to that. If the court wants to go that route, that's fine." The court then brought up the option of giving the jury the suppression of evidence instruction.[4] Herndon told the court he did not care if the court gave that instruction. He proceeded to accuse the court of assisting the prosecution and claimed: "This is a vindictive prosecution." After Herndon repeatedly charged the court with assisting the prosecution the court ordered the bailiff to take Herndon's prints. Once again Herndon vociferously and vigorously objected.
Five deputy sheriffs took Herndon's fingerprints by force. The trial court described what occurred for the record.
"The court earlier on ordered that Mr. Herndon's prints be taken; and, apparently, he was true to his word as he promised this morning. In his own words, he said they can do what they want. We can tear this courtroom up. We can get cracking. Apparently, even though the bailiff tried to talk to him, as witnessed by the court, he refused to cooperate [The bailiffs] started taking his arm to try to fingerprint him. He refused. He closed his fist. He started to, basicallyI don't know if fight is a good wordbut, basically, started to put dead weight on himself and refused to cooperate. Then more bailiffs were called m to assist, it appears the defendant is a very strong guy, and continued to resist and got on the floor; and, finally, they were able to take one thumb print of his left thumb for the expert to do a comparison."
After Herndon's print was thus obtained the prosecutor's expert testified it matched the thumbprint found in the salon.
Based on the trial court's description, a reasonable inference can be drawn of five deputy sheriffs wrestling the defendant to the ground and prying open his clenched fists to roll his fingerprints. Such an image is repugnant, to say the least. The question is: would such conduct violate Herndon's right to due process of law?
In the seminal case of Rochin v. California the United States Supreme Court held the due process clause prohibits the extraction of evidence from a defendant by the use of "force so brutal and so offensive to human dignity" as to "shock[ ] the conscience."[5]
The police in Rochin entered the defendant's house without a warrant and forced open the door to his bedroom. The officers spied two capsules on a night stand by the bed. When asked who the capsules belonged to, Rochin seized the capsules and put them in his mouth. A struggle ensued in which three officers jumped on Rochin and attempted to extract the capsules. When the officers could not overcome Rochin's resistance they handcuffed him and took him to a hospital where a doctor pumped his stomach and he vomited up the capsules. At trial the capsules were shown to contain morphine and Rochin was convicted on a drug possession charge. Reversing the' conviction the Supreme Court held the officers' behavior violated Rochin's right to due process of law. Summarizing the conduct described *141 above the court round itself compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combating crime too energetically.... They are methods too close to the rack and the screw to permit of constitutional differentiation."[6]
Rochin thus stands for the proposition "[e]vidence obtained by the state from a defendant by brutality is not admissible against him."[7]
Relying on Rochin, California courts have held the police acted unreasonably and in violation of due process when they: beat the suspect with a baton in order to force him to spit out a forged check;[8] kicked and punched the suspect in order to force him to give a handwriting exemplar;[9] choked the defendant to prevent him from swallowing contraband.[10]
We find the conduct in the present case so brutal, offensive and unreasonable as to violate Herndon's right to due process of law. A courtroom is not a wrestling ring and a trial is not a WWF spectacle. And, while a trial court has the statutory authority to "compel obedience to its ... orders" [11] it also has the duty to "preserve and enforce order in its immediate presence,"[12] "enforce order in the proceedings before it," [13] and "control in furtherance of justice, the conduct of its ministerial officers."[14]
This is not a case in which the defendant initiated violent behavior which required a physical response by the bailiffs.[15] Although Herndon threatened to "tear this courtroom up" if the court attempted to take his fingerprints by force it was the court's decision to put that threat to the test.[16] The court's decision was not only reckless but unreasonable. It was reckless because it could have resulted in serious injury to the defendant, the bailiffs, other court personnel and members of the public. It was unreasonable because there were numerous nonviolent alternatives available to the court in response to Herndon's refusal to submit his fingerprints. Two were suggested by the prosecutor: *142 the court could have instructed the jury it may consider Herndon's refusal to be fingerprinted as evidence of his consciousness of guilt or the court could have put off the fingerprint issue until after the lunch recess when the prosecution's foundational witness would be available. In addition, the court could have found Herndon had already made a judicial admission the prints on the booking card were his;[17] found the prosecution had laid a sufficient foundation for the fingerprint comparison;[18] or the court could have revoked Herndon's self-representation, banished him to the lock-up and appointed his standby counsel to represent him.
Although the trial court made serious errors in the manner in which it handled the fingerprinting issue we find beyond a reasonable doubt those errors did not prejudice Herndon.[19]
Any prejudice to Herndon's defense which might have resulted from the forcible fingerprinting was offset by the prejudice Herndon caused himself by bringing his resistance to the jury's attention.
The jury did not see the violent struggle between Herndon and the deputies and as far as the record shows Herndon did not bear any cuts, bruises or other indications he had recently been in a brawl with someone. Indeed, the jury would never have known anything about the incident with the deputies if Herndon had not brought it up in his cross-examination of the deputy who took his print and the prosecution's expert witness. Herndon's cross-examination of the deputy included this colloquy: "Q. Did I consent to that print that was taken? A. No, you did not. Q. It was taken by about, what, 15 officers, 10, 15 of your deputies? A. Not 15, no. Q. How many would you say? A. Approximately five. Q. Five? A. That's correct." The cross-examination of the prosecution's fingerprint expert included this exchange: "Q. After taking my print by force, handcuff me, beating me up. [Prosecutor]. Objection. Is there a question pending? The court: Sustained. Q. After taking my print by force, sir, you say you positive that I'm the guy? A. Based on the information I have in front of me at present, yes."
No reasonable juror would have failed to conclude the reason Herndon fought to avoid having his fingerprints taken was because he knew his thumbprint would match the thumbprint found at Dang's salon. The fact of Herndon's resistance clinched the identification of Herndon as the robber.
In case any juror might otherwise have failed to make the connection between Herndon's resistance to fingerprinting and his awareness of his guilt, his admitted refusal to be printed allowed the trial court to give the following instruction based on former CALJIC No. 2.06: "A defendant has no constitutional right to refuse to submit to scientific tests. A defendant may be compelled by the court to have his fingerprints rolled. If you find that a defendant attempted to suppress evidence against himself in any manner, such as by *143 the refusal to allow his fingerprints [to be] rolled, this attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, this conduct is not sufficient, by itself, to prove guilt; and its weight and significance, if any, are for you to decide."
Furthermore, a reversal for a new trial would award Herndon only a Pyrrhic victory. It is hard to imagine the prosecution again would fail to lay a proper foundation for the fingerprint comparison or fail to take advantage of Herndon's admissions in the first trial the prints on the booking card were his.
For the reasons stated above, we conclude the trial court's errors in handling the fingerprint issue do not entitle Herndon to a new trial.
II.-IV.[**]

DISPOSITION
The judgment is affirmed.
We concur: WOODS and ZELON, JJ.
NOTES
[*] Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts II, III and IV.
[1] See People v. Marsden (1970) 2 Cal.3d 118, 84 Cal.Rptr. 156, 465 P.2d 44.
[2] See Faretta v. California (1975) 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562.
[3] Former CALJIC No. 2.06. (See now CALCRIM No. 371 (Alternative A)); compare People v. Farnam (2002) 28 Cal.4th 107, 165, 121 Cal.Rptr.2d 106, 47 P.3d 988 [refusal to provide blood or hair sample].
[4] See footnote 3, above.
[5] Rochin v. California (1952) 342 U.S. 165, 174, 172, 72 S.Ct. 205, 96 L.Ed. 183.
[6] Rochin v. California, supra, 342 U.S. at page 172, 72 S.Ct. 205.
[7] People v. Matteson (1964) 61 Cal.2d 466, 469, 39 Cal.Rptr. 1, 393 P.2d 161.
[8] People v. Parham (1963) 60 Cal.2d 378, 384, 33 Cal.Rptr. 497, 384 P.2d 1001.
[9] People v. Matteson, supra, 61 Cal.2d at page 468, 39 Cal.Rptr. 1, 393 P.2d 161.
[10] People v. Sanders (1969) 268 Cal.App.2d 802, 804-805, 74 Cal.Rptr. 350. And see People v. Bracamonte (1975) 15 Cal.3d 394, 399-400, 124 Cal.Rptr. 528, 540 P.2d 624 discussing Rochin but relying on the 4th Amendment to hold unconstitutional the infliction of unnecessary pain on the suspect to cause her to agree to vomit up balloons of heroin.
[11] Code of Civil Procedure section 128, subdivision (a)(4).
[12] Code of Civil Procedure section 128, subdivision (a)(1).
[13] Code of Civil Procedure section 128, subdivision (a)(2).
[14] Code of Civil Procedure section 128, subdivision (a)(5).
[15] See People v. Mar (2002) 28 Cal.4th 1201, 1216, 124 Cal.Rptr.2d 161, 52 P.3d 95 [discussing use of physical restraint in the courtroom],
[16] As previously discussed when the issue of fingerprinting first arose and defendant stated he would not permit his prints to be taken the court issued its own threat, stating: "You don't have the right to refuse printing. I have these deputies here."
[17] Herndon argued to the court: "[The prosecution's] had that booking print since last week. [They're] not taking my print. They had my print already. They printed it." In cross-examining the prosecution's fingerprint expert Herndon asked: "Now, the night I was booked in ... you got my photo, and you got my print; it this true?" The expert responded: "That's correct."
[18] The prosecutor made at least a colorable argument she had laid a sufficient foundation for a fingerprint comparison using the booking card.
[19] Chapman v. California (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705; compare People v. Scott (1978) 21 Cal.3d 284, 295, 145 Cal.Rptr. 876, 578 P.2d 123.
[**] See footnote *, ante.